NORTH BANK, Plaintiff-Appellee, *v.* CIRCLE INVESTMENT CO. *et al.*, Defendants.—(ARITA VALESSARES, Defendant-Appellant.)

First District (4th Division)    No. 81-227

Opinion filed February 4, 1982.

Russell J. Hoover, of Jenner & Block, of Chicago, for appellant.

Raymond E. Stachnik, of Chicago (Abramson & Fox, of counsel), for appellee.

JUSTICE ROMITI delivered the opinion of the court:

The plaintiff filed suit against appellant, an accommodation guarantor of a secured note and certain other parties, to receive the amount due. The trial court after hearing the evidence dismissed the jury and directed a verdict for the plaintiff. Only Valessares has appealed, contending:

1. the plaintiff's extension of time for payment without the consent of the guarantor and without reserving rights released the guarantor;

2. the plaintiff's failure to insist on the performance of an agreement to pledge the beneficial interest in a land trust acted as an impairment of collateral and released the guarantor.

We agree with both contentions and reverse and enter judgment for the defendant-appellant.

On December 9, 1970, the plaintiff, North Bank, loaned $30,000 to Circle Investment Co., an investment group or joint venture whose

members owned percentage interests in a land trust. This note was later renewed in 1971. Defendant Valessares (defendant) was not a party to either the initial note or the first renewal.

From the outset, North Bank carried the loan on its books as one for which collateral had been pledged. The security was to be the beneficial interests in the land trust. No collateral was actually delivered to the bank. But sometime prior to March 1972, the bank obtained four "Agreements to Pledge," on printed forms apparently belonging to the bank. These were signed in blank by the makers of the note, by Keefe (another member of the Circle group) and by defendant who was the mother-in-law of one of the co-makers. The evidence is undisputed, however, that defendant had no interest in the land.

Samuel Partipilo, who had been executive vice president of North Bank from February 1972 to February 1973, testified that the forms used were the kind customarily used at North Bank to obtain collateral security. The body of the document would be filled out by the bank, and the document would then be recorded so that the bank would have a lien against the property. In this case the forms were not filled out but were kept in the file. Partipilo continually brought to the attention of the president of the bank, who originally made the loan, that the documentation on the loan still had not been completed. Sometime between 1970 and 1975 the property was sold by Circle to another investment group, the sellers receiving between $340,000 and $370,000 for their portion.

In April 1972, the bank agreed to renew the note, which was in default, if defendant would guarantee it. This renewal note was a demand note in the principal amount of $27,000, 9% interest payable per annum and after maturity. The form of note prepared by the bank was that which it customarily used for secured loans. The printed portion of the note recited that as collateral security there had been deposited with the bank "the following property, vis." In the blank which followed Partipilo had written in the words "Collateral per register." He meant the words to mean that the note was secured by certain collateral which was indicated in the bank's credit file. Defendant's signature appears as guarantor on the back of the note; the bank concedes she is only an accommodation party. Unlike many such guarantees, there are no provisions in this guarantee permitting matters such as extensions of time and the release of collateral.

Because the note was long overdue and Rieke, one of the co-makers and co-guarantors of the original note, had never signed the 1972 renewal, the bank on September 24, 1973, demanded substantial payment on the note. Following this demand, Zouvas, the remaining co-maker, and Keefe made a commitment to pay off the loan on November 15, 1973. This time was, however, repeatedly extended with the bank's agreement, until the bank in June 1975 confessed judgment on the note. At no time was

defendant given notice by the bank of these extensions of time for payment.

## I

■■■ It is clear from the record that plaintiff repeatedly agreed to extend the time for payment. It is also clear from the record that under Illinois law there was no consideration for plaintiff's agreement. The accrual of interest after the demand does not constitute additional consideration since the makers of the note were already obligated by the note to pay interest after the maturity of the note. (*Waters v. Simpson* (1845), 7 Ill. 570; *Theodosakis v. Austin Bank* (1981), 93 Ill. App. 3d 634, 417 N.E.2d 806; but see *Philco Finance Co. v. Patton* (1967), 248 Or. 310, 432 P.2d 686.) Likewise the maker's promise to pay the loan from the proceeds from certain financing when that deal was completed cannot be considered as consideration since no payment was in fact made and any implied agreement to secure the debt was unexecuted. *Newell v. Waller* (1882), 12 Ill. App. 306.

Accordingly the issue before this court is whether under the Uniform Commercial Code an agreement to extend the time for payment is effective to discharge the surety where there was no consideration for the agreement. It is clear that both at common law and under the Negotiable Instruments Law, before the surety was discharged there had to be a binding agreement to extend the time for payment, that is there had to be consideration. *Mitchell v. Peterson* (1981), 97 Ill. App. 3d 363, 422 N.E.2d 1026; *Lee v. Pioneer State Bank* (1981), 97 Ill. App. 3d 97, 423 N.E.2d 218; *Many, Blanc & Co. v. Jacobson* (1909), 149 Ill. App. 240; section 119(5) of the Negotiable Instruments Law (Ill. Rev. Stat. 1959, ch. 98, par. 141(5), repealed with the enactment of the Uniform Commercial Code in Illinois).

Thus unless the Uniform Commercial Code has changed the common law, the bank's repeated extensions of time for nearly two years did not act to discharge the defendant. Section 3—606 of the Code (Ill. Rev. Stat. 1973, ch. 26, par. 3—606) provides:

> "Impairment of Recourse or of Collateral. (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
>> (a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure or delay in effecting any required pre-

sentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

(2) By express reservation of rights against a party with a right of recourse the holder preserves

(a) all his rights against such party as of the time when the instrument was originally due; and

(b) the right of the party to pay the instrument as of that time; and

(c) all rights of such party to recourse against others."

The official comment to this section gives as a definitional cross-reference "Agreement" "Section 1—201." That section provides:

"(3) 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1—205 and 2—208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1—103)." Ill. Rev. Stat. 1973, ch. 26, par. 1—201(3).

The parties have cited no Illinois cases, and we have been able to find none, which have construed section 3—606(1)(a) or the definition of "agreement." Likewise none of the cases from other States relied on by plaintiff (*Stanley v. Ames* (Mass. 1979), 391 N.E.2d 908; *Mechanics National Bank v. Shear* (1979), 7 Mass. App. 255, 386 N.E.2d 1299; *Glover v. National Bank of Commerce* (1975), 258 Ark. 771, 529 S.W.2d 333) discuss section 1—201 and its effect on 3—606(1)(a). In *Stanley* the court merely states, as dictum, that an accommodation party is generally discharged from liability by binding extension of time. In *Mechanics* the court, relying on *Glover*, states as dictum that mere delay is not the equivalent of an agreement to suspend and that it did not believe section 3—606(1)(a) was intended to change the express requirement of the Negotiable Instruments Law that the agreement be binding upon the holder. In *Glover*, the court quotes from section 3—606(1)(a) and then states without further discussion "Of course the statute means an enforceable contract." (258 Ark. 771, 772, 529 S.W.2d 333, 335.) The court in *Glover* does not discuss or even refer to section 1—201.

We find *Lee Federal Credit Union v. Gussie* (4th Cir. 1976), 542 F.2d

887, the only case cited by the parties or that this court has been able to find that discusses the change in the statute and the effect of sections 1—201 or 3—606(1)(a), to be persuasive. That court states:

> "We recognize it is at least arguable that the agreed extension of time may not have been binding upon Credit and that it may have been able to institute proceedings against Lee prior to the date the check became payable. Yet, under the UCC in Virginia, it is the agreement which is controlling and not whether that agreement is necessarily binding. This represents a change from earlier Virginia law as is pointed out by the Virginia Comments to §8.3—606. There, it states:
>
> > 'Under the NIL [Negotiable Instruments Law] an agreement to extend the time of payment in order to have the effect of discharging parties secondarily liable had to be "binding upon the holder." The UCC, in accordance with its general definition of an agreement as being a bargain in fact, as distinguished from a contract, which is the effect given by law to an agreement, eliminates the requirement that the agreement be binding.'
>
> Compare, *e.g., Cawley v. Hanes*, 173 Va. 381, 389, 4 S.E.2d 376 (1939); *Cape Charles Bank, Inc. v. Farmers Mutual Exchange*, 120 Va. 771, 92 S.E. 918 (1917) dealing with the requirements under the NIL. The evidence clearly indicates that Credit agreed to extend additional time for payment on the note to Ernest Lee in exchange for the post-dated check which he tendered in August. This agreement, having been reached without the consent of either Rowe or Gussie, was sufficient to relieve them from further liability." 542 F.2d 887, 890.

■■ The plaintiff contends that the court in *Gussie* would have had to reach a different result under Illinois law since our code does not contain the comment referred to by the court. We disagree. The language of the two statutes referred to in the Virginia comment is the same in Illinois; that comment in no way extends the law beyond its clear meaning. Plaintiff erroneously argues that the Illinois comments imply that a binding extension agreement remains necessary under section 3—606(1)(a). All that comment says is that section 3—606(1)(a) also embraces release by extension of time which was covered by section 119(5) of the Illinois Negotiable Instruments Law. It in no way states that the law remained the same; indeed, in light of the marked change in wording from "by an agreement in favor of the principal debtor *binding* upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument" (emphasis added) to simply "agrees to suspend," it would be difficult not to conclude that a change in meaning was intended.

## II

■■ Even if defendant was not discharged by the extension of terms, however, she was discharged because of the bank's failure to perfect its security interest in the beneficial interests in the land trust. A creditor has a special duty towards a surety to take reasonable care to protect and preserve collateral. (*Executive Bank v. Tighe* (1978), 66 App. Div. 2d 70, 411 N.Y.S.2d 939; also *American Bank of Commerce v. Covolo* (1975), 88 N.M. 405, 540 P.2d 1294.) While a few cases have limited the application of section 3—606(1)(b) of the Code to direct impairment of the value of collateral in the possession of the creditor, the better and majority rule (see *Peoples Bank v. Pied Piper Retreat, Inc.* (W.Va. 1974), 209 S.E.2d 573) is that the section applies also to unreasonable acts which make the collateral unavailable to the surety and thus increase his risks even though the collateral is not in the creditor's possession or control. (*Beneficial Finance Co. v. Marshall* (Okla. App. 1976), 551 P.2d 315.) As that court remarked "[t]his view seems to be in accord with both the common law of suretyship and the expectations of the parties to a suretyship agreement." (551 P.2d 315, 320.) Thus it has been held that the failure to obtain insurance required by a note (*Arlington Bank & Trust v. Nowell Motors, Inc.* (Tex. Civ. App. 1974), 511 S.W.2d 415; *DeKalb County Bank v. Haldi* (1978), 146 Ga. App. 257, 246 S.E.2d 116, *cert. denied*) or a failure to file a claim under an insurance policy constituted an impairment of collateral releasing the surety. (*Tennessee Farmers Mutual Insurance Co. v. Scott* (Tenn. App. 1970), 8 U.C.C Rep. 399.) And the majority of States, including Illinois, agree that a failure to perfect a security interest constitutes an unjustifiable impairment of collateral. *Wohlhuter v. St. Charles Lumber & Fuel Co.* (1975), 25 Ill. App. 3d 812, 323 N.E.2d 134, *aff'd* (1975), 62 Ill. 2d 16, 338 N.E.2d 179; *First Bank & Trust Co. v. Post* (1973), 10 Ill. App. 3d 127, 293 N.E.2d 907; *Farmers State Bank v. Cooper* (1980), 227 Kan. 547, 608 P.2d 929; *Baitcher v. National Industrial Bank* (Fla. App. 1979), 368 So. 2d 439; *Beneficial Finance Co. v. Marshall* (Okla. App. 1976), 551 P.2d 315; *Executive Bank v. Tighe* (1978), 66 App. Div. 2d 70, 411 N.Y.S.2d 939; *Langeveld v. L.R.Z.H. Corp.* (1977), 74 N.J. 45, 376 A.2d 931; *In re Estate of Voelker* (Iowa 1977), 252 N.W.2d 400; *American Bank of Commerce v. Covolo* (1975), 88 N.M. 405, 540 P.2d 1294; *Peoples Bank v. Pied Piper Retreat, Inc.* (W.Va. 1974), 209 S.E.2d 573; *White v. Household Finance Corp.* (1973), 158 Ind. App. 394, 302 N.E.2d 828; *Shaffer v. Davidson* (Wyo. 1968), 445 P.2d 13.

As provided in the Illinois Commercial Code—Secured Transactions, sections 9—106, 302, a security interest may be created in a beneficial interest of a land trust. Such security interest is enforceable against third parties if properly perfected and is enforceable in any event against persons who are not secured parties and who give value with knowledge

of the security interest. (Ill. Rev. Stat. 1971, ch. 26, par. 9—301.) Before the middle of 1973, the creditor had to file a financing statement to perfect his security interest in a beneficial interest in a land trust. (*Mid-West National Bank v. Metcoff* (1974), 23 Ill. App. 3d 607, 319 N.E.2d 336; *Levine v. Pascal* (1968), 94 Ill. App. 2d 43, 236 N.E.2d 425, *appeal denied* (1968), 39 Ill. 2d 626.) Since then, a financing statement is not required. Ill. Rev. Stat. 1973, ch. 26, par. 9—302.

The bank failed to file in this case as required by statute. It also failed to give notice to would-be purchasers. Assuming the bank had had an enforceable security interest, it is clear that its failure to do these acts would, under Illinois law, have discharged the defendant.

The bank argues that despite its failure to perfect its security agreement the defendant should not be discharged because the bank also failed to perfect its pledge arrangement and obtain a valid security interest. Under section 9—203 of the Code (Ill. Rev. Stat. 1971, ch. 26, par. 9—203), for a security interest to attach, the debtor must have signed a security agreement, that is, an agreement which creates or provides for a security interest (Ill. Rev. Stat. 1971, ch. 26, par. 9—105(1)(h)), which contains a description of the collateral. This description need not be specific if it reasonably identifies what is described. Ill. Rev. Stat. 1971, ch. 26, par. 9—110.

■■ We agree that the bank failed to comply with section 9—203 of the Code. We do not agree, however, with the bank's contention that the defendant should suffer from the bank's failure. "The duty imposed on a creditor under UCC §3—606(1)(b) encompasses the good faith obligation to exercise reasonable means to protect the rights of guarantors." (*American Bank of Commerce v. Covolo* (1975), 88 N.M. 405, 408, 540 P.2d 1294, 1297; *Beneficial Finance Co. v. Marshall* (Okla. App. 1976), 551 P.2d 315, 319.) It is incumbent upon the creditor to take all normal precautions to perfect all security interests. (*Baitcher v. National Industrial Bank* (Fla. App. 1979), 368 So. 2d 439.) A guarantor should be entitled to expect a creditor to behave with at least a minimal degree of commercial reasonableness and care and to make a reasonable effort to secure its collateral. (*Leslie Fay, Inc. v. Rich* (S.D.N.Y. 1979), 478 F. Supp. 1109.) Here the bank did not do so although the note signed by defendant stated that the debt was secured.

Accordingly the judgment of the trial court is reversed and judgment entered for defendant-appellant.

Reversed.

JOHNSON, P. J. and LINN, J., concur.