INTERNATIONAL PAPER
COMPANY, Plaintiff,

v.

Jeffrey GROSSMAN, Defendant.

No. 79 C 3417.

United States District Court,
N. D. Illinois, E. D.

June 18, 1982.

Eugene W. Beeler, Jr., Mangum, Beeler, Schad & Diamond, Chicago, Ill., for plaintiff.

David H. Pauker, Juron, Pauker & Rubin, Ltd., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This action has been tried upon the facts without a jury. After considering all the evidence and the briefs and arguments of counsel, in accordance with Fed.R.Civ.P. 52(a) the Court finds the facts and states its conclusions of law as follows:

*Findings of Fact ("Findings")*

1. International Paper Company ("IPC") is a New York corporation with its principal place of business in the State of New York. Jeffrey Grossman is a citizen of the State of Illinois. More than $10,000 is in controversy between IPC and Grossman.

2. Both before June 1976 and continuously thereafter until just before June 1, 1978 Emisco Industries, Inc. ("Emisco") was a warehouser, broker, distributor and (to a minor extent) fabricator of corrugated paper products. It was a privately-held corporation with the following shareholders and officers:

(a) Grossman was its President, a director and an 88% shareholder.

(b) William G. Bailes ("Bailes") was its Vice President, a director and a 6% shareholder.

(c) John Taglianetti ("Taglianetti") was a director and a 6% shareholder.

3. In 1976 Emisco had been purchasing products from IPC on a limited credit basis. Bailes requested that IPC substantially increase Emisco's line of credit.

4. At a meeting in New York Neil Collins of IPC's New York Credit Department informed Bailes additional credit could not be granted to Emisco without Grossman's personal guaranty. Shortly thereafter Bailes arranged a New York meeting attended by Grossman and Collins to discuss the subject, and IPC insisted on Grossman's personal guaranty as a condition of increased credit.

5. About June 9, 1976 Grossman executed a written document whereby he personally guaranteed Emisco's existing and future debts to IPC. That document (the "Guaranty," Pl. Ex. 3) was in the form of a letter from Grossman to IPC and followed verbatim the IPC "standard guaranty" form, except for the inclusion of a provision requested by Grossman (on advice from his lawyer), agreed to by IPC and not material to this litigation. In relevant part the Guaranty provided:

This guaranty shall be deemed to be effective as of the date hereof upon receipt by you and shall be binding upon the heirs and assigns of the undersigned and shall enure to the benefit of your successors and assigns.

The undersigned further agrees that the terms and conditions of this guaranty shall apply not only to amounts falling due in respect of future sales but also to amounts owing to you from transactions entered into between you and the Purchaser prior to the date of this guaranty.

Following receipt of the Guaranty, IPC substantially increased the credit it extended to Emisco and internally established a credit limit of $100,000 for Emisco.

6. After delivery of the Guaranty, Grossman did not personally deal with any representative of IPC in any respect, nor did he personally take any action to limit the amount of Emisco's indebtedness to be covered by the Guaranty. Bailes was responsible for Emisco's credit and financial dealings with IPC both before and after delivery of the Guaranty.

7. There is a dispute between IPC and Grossman as to whether Grossman sent a February 13, 1978 letter to IPC revoking the Guaranty either in strict accordance with its terms or in a commercially reasonable manner. Various aspects of Grossman's testimony in that respect, as well as that of Grossman's supporting witnesses, tax this Court's credulity. It is unnecessary however to resolve the disputed issue, for it is clear in any event that none of the relevant IPC executives or other personnel was aware of the claimed revocation. All remaining Findings and Conclusions are based on the premise that the claimed revocation was not effective.

8. In the spring of 1978 American Packaging Company ("American Packaging") was a warehouser, broker, distributor, manufacturer and fabricator of folding cartons involved in Chapter XI bankruptcy proceedings. Its principal secured creditor was Continental Illinois National Bank & Trust Company of Chicago ("Continental Bank"). It was not a customer of IPC. It carried on a much larger operation than Emisco and was engaged in a substantially different business (see Finding 9).

9. During 1978 Grossman's role in Emisco's operation and control had diminished substantially. In the spring of that year Continental Bank initiated negotiations between the then ownership of American Packaging and Grossman for the merger of

Emisco into American Packaging. That merger was contemplated to change the nature of the company's business operations by adding, to its brokering of corrugated containers, its buying and selling of waste paper and its manufacture of corrugated discs (pizza circles) on a small scale (all of which were Emisco's prior operations), an operation involving the large-scale manufacture of folding cartons (American Packaging's basic business). At the same time Bailes and Taglianetti negotiated with Grossman to acquire control of Emisco, with Grossman to resign from his position as chief executive officer and adopt a passive role, available for consultation rather than as an active corporate participant.

10. As the result of the negotiations for Grossman's lessened corporate involvement referred to in Finding 9, immediately before June 1, 1978:

(a) Grossman transferred shares of Emisco to Bailes and Taglianetti so that each became a one-third shareholder of Emisco and Grossman's ownership of Emisco shares was reduced to one-third from his former 88% position.

(b) Bailes became President of Emisco in place of Grossman.

(c) All three shareholders remained directors.

As the result of the American Packaging negotiations, on June 1, 1978 Emisco did merge into American Packaging, which became the surviving corporation. Both the stockholdings and the officer-directorships of American Packaging after the merger paralleled the immediately pre-merger Emisco arrangements referred to in this Finding 10.

11. As a condition of the merger, Continental Bank agreed to subordinate and restructure American Packaging's existing indebtedness of more than $1,007,000 and to lend additional funds to American Packaging to finance its future operations.

12. Both before and after the merger Bailes informed IPC of the proposed transaction (including the facts that American Packaging would be the surviving corporation, so that Emisco would no longer exist, and that the infusion of new capital by Continental Bank would permit a substantial reduction in the old Emisco debt to IPC). IPC's senior credit manager Michael Russo ("Russo," who was in charge of Emisco's account) spoke with IPC's in-house legal department about the merger, asking what its legal effect would be on the Grossman guaranty. Russo was told their consensus was that the Guaranty was still valid and that Grossman would be bound for debts to be incurred by American Packaging. Neither Russo nor any other IPC representative made any effort then or at any other time to communicate with Grossman as to whether that was also his understanding, or on any other subject relating to the Guaranty or the effect of the merger.

13. IPC also banked with Continental Bank. Both before and after the merger it caused the Continental Bank officer handling IPC's account in New York to call the Continental Bank officer handling the American Packaging account in Chicago to obtain full information as to the merger and the proposed post-merger operations of American Packaging. That information included such matters as American Packaging's capitalization, Continental Bank's involvement in financing (advancing $1.1 to 1.2 million), Continental Bank's positive evaluation of Bailes as the new company head (Goodman having stepped down as chief executive officer) and other relevant factors.

14. After the merger Bailes wrote IPC and other Emisco "Customers, Suppliers and Friends" a June 1, 1978 form letter saying Emisco had "acquired American Packaging Corporation in a stock merger...." That form letter was of course inaccurate in technical terms, but it did not mislead IPC in any respect (IPC being fully apprised of the true nature of the merger transaction, as reflected in Findings 12 and 13). As required by law, the merger agreement was recorded as a public document, but IPC had actual as well as constructive notice of the real facts.

15. Bailes also wrote Russo a June 6, 1978 letter (see Appendix A) relating to the

Grossman guaranty. That letter was not authorized by Grossman nor seen by him before it was sent. When Grossman later received a copy of the letter from Bailes he was extremely upset because he believed he was not responsible for any obligations to be incurred by American Packaging, although he recognized he was responsible for IPC shipments to Emisco while the Guaranty had been in effect. Grossman neither directed Bailes to communicate with Russo to correct the letter nor did he feel it necessary to do so. IPC did not rely on Bailes' letter in its decisions then or thereafter to extend credit to American Packaging, having arrived at its decisions based on its own legal department's analysis of the terms of the Guaranty (its own form, it will be remembered) and the legal effect of the merger, as well as upon its own evaluation of American Packaging as a credit risk, as reflected in Finding 16. To the extent IPC's witnesses testified to the contrary, this Court does not credit such testimony in light of the other credible evidence in the record supporting the findings in the preceding sentence.

16. American Packaging's operations required the substantial purchase from IPC of "bleached board," a product not needed in Emisco's prior operations but constituting the principal raw material for the manufacture of folding cartons (American Packaging's main product line). Bleached board sales were handled by an IPC sales and credit division different from that Emisco had been dealing with. That division initially required that American Packaging pay cash in advance for its initial order from IPC. IPC Credit Department personnel then inquired of Continental Bank whether loan funds would be advanced to American Packaging and be available to finance its future operations. American Packaging did substantially reduce the previous debt of Emisco to IPC, as Bailes had said would be the case. IPC's credit division handling the bleached board sales then approved American Packaging for credit. On June 23, 1978 IPC merged the old Emisco account on its books with the American Packaging account, and it thereafter extended credit to American Packaging. Its basic reason for so doing was its knowledge of Continental Bank's provision of financing to American Packaging.

17. Grossman undertook substantial personal liability to Continental Bank in connection with the Emisco-American Packaging merger, part of which liability was necessary to obtain funds to purchase major machinery, equipment and other assets previously leased to American Packaging by third parties. Grossman's individual liability and losses incurred as the result of American Packaging's subsequent business failure are well in excess of any benefits he received during the course of American Packaging's post-merger business activities.

18. American Packaging encountered major business problems after the merger, ultimately leading to its making an assignment for the benefit of creditors in June 1979. On May 22, 1979 American Packaging owed $208,240.16 to IPC. By separate letters dated May 22, 1979 IPC demanded payment of that amount from American Packaging and from Grossman as guarantor. American Packaging was insolvent and failed to pay any of the amount owing IPC, and Grossman refused and continues to refuse to pay any amount as guarantor.

19. Although there were some indications by counsel during the course of trial that $2,000 to $3,000 of pre-merger Emisco indebtedness remains unpaid, IPC did not provide proof adequate to support a judgment in that respect for any specific amount.

*Conclusions of Law ("Conclusions")*

1. This Court has jurisdiction over the parties. It has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a).

2. Because this is a diversity action, Illinois choice of law rules provide the rule of decision. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As this Court has said on prior occasions, Illinois courts have not yet extended the "most significant con-

tacts" test to contract actions, but still look in a somewhat mechanistic way to the respective places of execution and performance. Our Court of Appeals stated the operative rules in *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 542 (7th Cir. 1978):

> Under Illinois conflict of law principles, the law of the place of performance governs the construction and obligations of the contract when the place of making and place of performance differ, if the agreement is to be wholly performed in one jurisdiction. If more than one place of performance is involved, the place of making of the contract governs its construction and obligations.

3. In this action the relevant factors point to the use of New York substantive law:

> (a) Under the terms of the Guaranty itself, it was to become effective "upon receipt" by IPC—a New York event.
>
> (b) IPC's performance under the Guaranty, the extension of credit in reliance thereon, was a decision made (and thereafter renewed) in New York.
>
> (c) Emisco's performance of the underlying obligation—*payment*, the thing guaranteed by the Guaranty—was, at the time the Guaranty was delivered, called for in New York. If Grossman had to perform under the Guaranty, that performance would also take the form of *payment* to IPC in New York. Even were Grossman's performance inaccurately viewed as taking place in Illinois because he resides here, the multiple places of performances notion described in *Finley* would call for the place of contracting—New York—to control.
>
> (d) If IPC's performance were considered its shipment of merchandise rather than its extension of credit, that would also be multistate, bringing into play the principle of the last sentence of Conclusion 3(c).

Because the "most significant factors" analysis would produce the same result, New York rather than Illinois substantive law would also be called for under that approach.

4. Both New York and Illinois follow the doctrine of construing guaranties strictly against the party in whose favor they run. *Heck v. Coverley Properties, Inc.*, 64 App.Div.2d 561, 406 N.Y.S.2d 829 (1978); *Telegraph Savings & Loan Ass'n v. Guaranty Bank & Trust Co.*, 67 Ill.App.3d 790, 24 Ill.Dec. 330, 385 N.E.2d 97 (1st Dist. 1978). Indeed, one case on which IPC improvidently seeks to rely, *Fannin State Bank v. Grossman*, 30 Ill.App.2d 484, 489, 175 N.E.2d 268, 270 (1st Dist. 1961) stands not only for that proposition but for the added principle that:

> In these transactions it is generally the lender who prepares the instrument, and its provisions are in accordance with the established rule construed most strongly against it.

IPC prepared the Guaranty using its standard form, and any areas of real or arguable ambiguity are accordingly to be construed against it.

5. IPC incorrectly characterizes this case in terms of "revocation" of the Guaranty or "assignment" of the Guaranty. Conceptually neither is accurate. Grossman guaranteed obligations of *Emisco* resulting from its purchases of IPC products. *Emisco* was designated as the "Purchaser" under the Guaranty. Even assuming no revocation, Grossman's guaranty would continue to extend solely to Emisco (that is, pre-merger) obligations to IPC. IPC's "standard guaranty" form provided:

> (a) It was binding on *Grossman's* heirs and assigns.
>
> (b) It enured to the benefit of *IPC's* successors and assigns.

By normal principles of contract construction (the negative implications from the contractual language) as well as under the legal doctrines referred to elsewhere in these Conclusions, there was *no* basis for finding or implying an intention to guarantee obligations of *Emisco's* successors or assigns. This concept of interpreting an unequivocal and unambiguous guaranty contract according to its literal language would also apply were Illinois law rather than New York law viewed as controlling.

*Lawndale Steel Co. v. Appel*, 98 Ill.App.3d 167, 53 Ill.Dec. 288, 173–74, 423 N.E.2d 957, 963 (2d Dist. 1981) and cases cited.

■ 6. Cases dealing with assignment of the benefit of the guaranty by the *creditor*,[1] or a mere name change by the corporate *debtor*,[2] are not in point. New York's appellate court dealt a half-century ago with the identical question posed by this case—the effect on a guaranty of the debtor's merger into another corporation (with the consequent loss of identity of the debtor)—and has decided that the guarantor could not be held liable for defaults occurring after the merger. *Worth Corp. v. Metropolitan Casualty Ins. Co. of New York*, 142 Misc. 734, 255 N.Y.S. 470 (1932). That result controls here under *Erie v. Tompkins* principles, and it follows a fortiori where the extensions of credit on which plaintiff sues were given *after* the merger.

7. Perhaps equally important, *Worth* represents sound law—particularly when one takes into account the dramatic difference between an individual's guaranty of obligations incurred by his almost wholly-owned (88%) corporation and his guaranty of future obligations of a corporation in which his monetary stake is a minority one. IPC would seek to impose 100% of the risk of loss on Grossman, though his potential benefit from any success of American Packaging was just 33⅓%. To distort and extend the language of the Guaranty to a situation not contemplated or provided for when it was drafted would do violence to the principles announced in the Illinois case law as well as in *Worth* and other New York cases.[3]

■ 8. Neither IPC nor Grossman was estopped by its or his conduct in this matter. Each was a sophisticated business person playing its or his cards close to the vest. Each clearly decided to take its or his chances as to the legal effect of the merger on the Guaranty—*IPC* by reaching its own legal conclusion that the Guaranty *would* extend to American Packaging's post-merger purchases, and by not communicating with Grossman to inquire of his understanding or to seek confirmation of its own, and *Grossman* by relying on his own belief that the Guaranty *would not* so extend, and by not communicating with IPC to say Bailes' letter therefore spoke no more than a half-truth. Both parties failed to comply with full disclosure standards. IPC, as a party itself without clean hands in that respect, cannot invoke the equitable doctrine of estoppel. Alternatively and equally dispositive, IPC has failed to prove the necessary element of *reliance* as a basis for estoppel (see Findings 15 and 16). *Orth-O-Vision, Inc. v. Home Box Office*, 474 F.Supp. 672, 680 (S.D.N.Y.1979); *Gasbarra v. St. James Hospital*, 85 Ill.App.3d 32, 44–45, 40 Ill.Dec. 538, 549–50, 406 N.E.2d 544, 554–55 (1st Dist. 1979). Accordingly the legal effect already stated in Conclusions 6 and 7 controls.

■ 9. IPC has not sustained its burden of proving the amount if any remaining unpaid on Emisco's pre-merger obligations to IPC, the only amount for which Grossman would remain liable.

10. Judgment is entered in favor of Grossman and against IPC.[4]

1. *Essex International, Inc. v. Clamage*, 440 F.2d 547, 550 (7th Cir. 1971).

2. *Scovill Mfg. Co. v. Cassidy*, 195 Ill.App. 448, 456 (1st Dist. 1915); *Cargill, Inc. v. Buis*, 543 F.2d 584, 587–88 (7th Cir. 1976) (Indiana law applied; here there was a merger, but the superseded party was the corporate *debtor*, which simply changed its name).

3. For this reason the choice of law question decided in Conclusion 3 has little real world significance. In that sense this opinion has departed from the approach articulated by our Court of Appeals in *In re Air Crash Disaster Near Chicago*, 644 F.2d 594, 605 n.2 (7th Cir.

1981). It has done so however because *Worth* is a direct precedent on all fours under New York law, while Illinois law must be derived more inferentially.

4. If IPC were to move in timely fashion, with appropriate support, for a judgment to the limited extent referred to in Finding 19, this Court would consider entertaining such a motion. In that event, however, all costs in this action will continue to be allowed to Grossman and taxed against IPC. In any event, the possibility of such a post-judgment motion shall not affect the intended status of these Findings and Con-

clusions as a final judgment in favor of Gross-