**Barbara J. MORRIS,**
**Appellee/Cross-Appellant,**

**v.**

**COLUMBIA NATIONAL BANK OF CHICAGO,**
**Appellant/Cross-Appellee.**

**Nos. 86 C 6700, 86 B 4767.**

United States District Court,
N.D. Illinois, E.D.

Nov. 4, 1987.

Benjamin D. Schwartz, Altheimer & Gray, Chicago, Ill., for appellant/cross-appellee.

Ralph E. Brown, Whitman H. Brinsky, Jeffrey E. Schiller, Walsh, Case, Coale & Brown, Chicago, Ill., for appellee/cross-appellant.

### MEMORANDUM AND ORDER

MORAN, District Judge.

On March 26, 1986, appellee Barbara Morris filed a petition in the Bankruptcy Court for the Northern District of Illinois seeking relief under Chapter 11 of the Bankruptcy Code. On May 13, 1986, appellant Columbia National Bank of Chicago ("Columbia") moved in bankruptcy court for an order modifying the automatic stay granted under 11 U.S.C. § 362 which precluded Columbia from foreclosing on Morris' properties. Columbia argued that under 11 U.S.C. § 362(d)(1) Columbia's interest in Morris' properties was not adequately protected, that under 11 U.S.C. § 362(d)(2) Morris did not have equity in the properties and that those properties were not necessary for her reorganization.

The bankruptcy judge found that the properties were not required for Morris' reorganization (Findings, at 15). The court found, however, that Morris had sufficient equity in the properties to protect Columbia's interest (Findings, at 18) and therefore denied Columbia's motion to modify the stay. In order to find that Morris had sufficient equity in her properties, the bankruptcy judge first found that Morris was entitled to be partially discharged from her obligations as a guarantor on a Columbia loan to Chemisphere Incorporated ("Incorporated").

Columbia now appeals the denial of its motion to modify the stay on Morris' property. Morris cross-appeals, arguing that the bankruptcy court should have held that her defenses entitled her to be fully discharged from her guaranty to Columbia. This court has appellate jurisdiction under 28 U.S.C. § 158(a). For the reasons stated, we affirm in part, reverse in part, and remand.

### FACTS

The facts regarding this tangled financial thicket were largely set forth in the bankruptcy judge's comprehensive opinion, although they are supplemented somewhat by the record on appeal. That record consists of numerous exhibits and the transcript of an extended evidentiary hearing.

The record is somewhat unclear as to when and to what extent Incorporated, or some predecessor, had been in business. Its intended business was the storage and treatment of hazardous waste materials. It is clear, however, that for our purposes it was not operational on December 17, 1983. On that date Incorporated executed a $625,000 note payable to Columbia and a Term Loan Agreement ("Agreement"). The Agreemet provided that $100,000 of the proceeds would be used to open a savings account at Columbia, $250,000 would go to Acme Refining Company ("Acme") (for purchase of a physical site for operations), $100,000 would be disbursed to a law firm for legal services, $100,000 would be deposited in a checking account for operating expenses, $50,000 would be paid for various goods and services, and $25,000 would be used to open a certificate of deposit at Columbia. The loan was secured by a first mortgage on one Morris property, a second mortgage on the other Morris property, the $100,000 savings account, a $100,000 Acme certificate of deposit, and all yet to be generated accounts and notes receivable.

The note contained an acceleration clause in the event of Incorporated's default. The

Agreement contained several covenants which required Incorporated to file financial statements. It restricted Incorporated from encumbering any of its property, incurring any additional indebtedness or entering into any other agreements which would restrict Incorporated's ability to comply with the terms of the Agreement. On that same day, Morris (and one other individual) executed a printed guaranty on the back of the note, and Morris executed a separate guaranty and the mortgages. Morris also became a 40% shareholder in Incorporated as of that date. Columbia did not obtain a security interest in the site being purchased from Acme, ostensibly because of concerns about having an interest in property which was the situs of toxic wastes.

On or about August 31, 1984, Incorporated transferred the majority of its assets to Chemisphere Partners ("Partners"), a limited partnership of which Incorporated became one of the two general partners. Charles W. McKiel, Jr. ("McKiel"), president of Incorporated, became the other general partner. A limited partner invested $500,000 in the new entity. Incorporated had not yet, by then, begun to generate accounts receivable. The bankruptcy judge found that the transfer of assets was accomplished without the knowledge or consent (either express or implied) of Columbia or Morris (Findings, at 9). The bankruptcy court further found that the transfer rendered it less likely that Columbia's undersecured debt would be paid and substantially increased Morris' risk on her obligations to Columbia (Findings, at 17). Partners assumed the note which Incorporated owed to Columbia. Partners subsequently took out substantial additional loans from another bank, Midwest Bank & Trust Co. ("Midwest").

Although payments from Incorporated and Partners were occasonally late, the loan was current as of February 20, 1985. On April 18, 1985, after Incorporated fell two months behind on its payments, Columbia told Incorporated that it had to make those payments within seven days. Incorporated did not make the payments and on April 25, 1985 Columbia declared Incorporated in default on the note and accelerated payment of the entire note. In the meantime, from April and into the summer of 1985, Partners generated receivables of approximately $80,000, but it was apparently not operational thereafter. In the meantime, also, Columbia declared a setoff against the indebtedness on the passbook account and the certificate of deposit it was holding as collateral for the Incorporated loan. Because the setoff did not completely cover the loan, Columbia then filed foreclosure actions against Morris' properties.

The bankruptcy court found the fair market value of Morris' properties to be $564,500 after accounting for a first mortgage senior to Columbia's. After the setoff, Morris still owed Columbia $442,500 on the note. To the debt, the bankruptcy court added late charges, interest and reasonable attorneys' fees, resulting in a debt as of June 19, 1986 of $552,800. The court also added a 6% sales and brokerage cost which further increased the debt to $586,600. Finally, the court found that interest is continuing to accumulate on the note at the rate of $245.84 per day (Findings, at 11).

In opposing Columbia's motion to modify the stay, Morris offered eight affirmative defenses. The evidentiary hearing was complicated by testimony and argument that Morris may have been defrauded by one or more of the principals in the Chemisphere enterprises. The issues here, however, ultimately related to the relationship between Morris and Columbia and Columbia's conduct as a creditor, not to any possible claims by Morris against McKiel or others. The bankruptcy court found that Columbia's motion to modify the stay would have been granted if Morris failed to prove either of the two special defenses of a guarantor, the only defenses which are the subject of this appeal. The two defenses at issue are the unjustifiable impairment defense in which Morris claimed that Columbia unjustifiably impaired assets securing Incorporated's debt, and the "material change" defense whereby Morris alleged that a material change in Incorporated significantly increased her risk as a guarantor.

## DISCUSSION

### Unjustified Impairment Defense

Morris contended in bankruptcy court that Columbia unjustifiably impaired the collateral securing Incorporated's indebtedness and that this impairment discharged her from her obligations under the guaranty. She complained that Columbia failed to pursue its rights under the Agreement with the vigor necessary to maximize its recovery from Incorporated and also failed to preserve its rights in accounts receivable. The judge found Columbia's actions (and inactions) with respect to Incorporated's transfer of assets to Partners to be commercially reasonable. The court also found that Columbia's actions in accepting late payment, delaying declaring a default and finally declaring a default were all commercially reasonable as defined by U.C.C. § 3–606(1)(b) and adopted in Illinois as Ill.Rev.Stat. ch. 26, ¶ 3–606(1)(b) (Findings, at 17). Finally, the bankruptcy court found that Morris explicitly waived her defense of complaining about the bank's actions or inactions with respect to the collateral in question. *Id.*

On appeal, Morris argues that the bankruptcy court's finding that Columbia acted commercially reasonably was in error. She points out that the Illinois courts have interpreted Ill.Rev.Stat. ch. 26, ¶ 3–606(1)(b) as discharging a guarantor where a creditor fails to perfect its security interest in the collateral (here the accounts receivable generated by Partners), *North Bank v. Circle Investment Co.*, 104 Ill.App.3d 363, 369–70, 432 N.E.2d 1004, 1007–09, 60 Ill. Dec. 105, 108–10 (1st Dist.1982) or released

the collateral without the guarantor's consent.[1] *McHenry State Bank v. Y & A Trucking, Inc.*, 117 Ill.App.3d 629, 634, 454 N.E.2d 345, 349, 73 Ill.Dec. 485, 489 (2d Dist.1983). Morris therefore contends that Columbia's actions were commercially unreasonable and she should be released from her obligations.

Morris correctly states the test for unjustified impairment of collateral under Ill.Rev.Stat. ch. 26, ¶ 3–606(1)(b). *See id.* at 634, 454 N.E.2d at 349, 73 Ill.Dec. at 489; *North Bank*, 104 Ill.App.3d at 369–70, 432 N.E.2d at 1007–09, 60 Ill.Dec. at 108–10. However, it may be that the guaranty is not a negotiable instrument and therefore does not fall within the provisions of the U.C.C.[2] Perhaps the matter is governed by Illinois common law.

Illinois courts hold that, at common law, if a creditor releases collateral without the surety's consent, that surety is released from the agreement's obligations *pro tanto*. *Chicago Bridge & Iron Co. v. Reliance Ins. Co.*, 46 Ill.2d 522, 526, 264 N.E. 2d 134, 136 (1970). This rule was applied to guarantors long before the U.C.C. distinguished negotiable from non-negotiable instruments. *Barrett v. Shanks*, 382 Ill. 434, 440, 47 N.E.2d 481, 484 (1943). Despite these cases, one federal district court, analyzing Illinois common law, determined that the unjustifiable impairment defense was unavailable to parties of a non-negotiable instrument. *Federal Reserve Ins. Corp. v. Hardt*, 646 F.Supp. 209, 211 (C.D. Ill.1986). While the court there recognized the defense as it is clearly laid out for surety relationships, the court rejected the

---

1. The parties stipulated and the bankruptcy judge found that Illinois law governs the terms of the Agreement. Findings, at 13. The court made no explicit finding concerning choice of law for the guaranty agreement. Furthermore, the parties in their briefs appear to assume that Illinois law also governs that guaranty. We therefore will apply Illinois law to substantive issues of the effect of the guaranty on Morris' liability.

2. In order to receive protections under Ill.Rev. Stat. ch. 26, ¶ 3–606(1)(b), Morris must be a "party to the instrument." The U.C. further defines the term instrument as a negotiable instrument. *Id.* at ¶ 3–104(1) (1985) (emphasis

added). Morris signed on the reverse of a note. However, the interest rate on the unpaid balance of the note was to be computed at a variable rate of interest: 3% over the prime rate. Findings, at 4. An otherwise negotiable instrument with a variable rate of interest is not for a sum certain and thus is non-negotiable. *Northern Trust Co. v. E.T. Clancy Export Corp.*, 612 F.Supp. 712, 715 (N.D.Ill.1985). Similarly, the guaranty is not a negotiable instrument. *Exchange Nat'l Bank v. Brown*, 41 U.C.C.Rep.Serv. (Callaghan) 895, 898 (N.D.Ill.1985); *Ishak v. Elgin National Bank*, 48 Ill.App.3d 614, 617, 363 N.E.2d 159, 161, 6 Ill.Dec. 630, 632 (2d Dist. 1977).

defense for guarantees on a non-negotiable instrument. While we question the rationale of this holding,[3] we find it unnecessary to decide the matter in light of our affirmance of the bankruptcy court's finding of waiver.

■ The bankruptcy court found that Morris waived her right to complain of Columbia's actions with respect to the collateral (Findings, at 16). Morris contends that she received protection under the Agreement and that those terms, where they contradict terms of the printed waiver, should control. *See Farmers State Bank v. Doering*, 80 Ill.App.3d 959, 962, 400 N.E. 2d 705, 708, 36 Ill.Dec. 285, 288 (4th Dist. 1980). But she was not a party to that Agreement and it was not entered into for her benefit. We must look to the guaranty.

The Illinois Supreme Court has stated that the rules for interpreting guarantees are the same as those for other contracts. *Blackhawk Hotel Associates v. Kaufman*, 85 Ill.2d 59, 64, 421 N.E.2d 166, 168, 51 Ill.Dec. 658, 660 (1981). Furthermore, where a guaranty is unambiguous, it must be interpreted as written. *In re Tiemann*, 141 Ill.App.3d 512, 517, 490 N.E.2d 200, 204, 95 Ill.Dec. 727, 731. However, the guaranty is strictly construed in favor of the guarantor. *Id.*

In this case there is no ambiguity nor conflict between documents, only a broad waiver. The waiver in the guaranty which was attached to the Agreement stated in part:

> The liability hereunder shall in no wise be affected or impaired by ... any sale, pledge, surrender, compromise, settlement, exchange, release, renewal extension, modification, election with respect

to any collateral.... An act of commission or omission of any kind or at any time upon the part of [Columbia] with respect to any matter whatsoever, other than the execution and delivery by [Columbia] to the undersigned of an express written release or cancellation of this guaranty shall not in any manner whatsoever affect or impair this guaranty nor the liability thereunder. [Morris] hereby consents to all acts of commission or omission of [Columbia] hereinabove set forth.

(Columbia's exh. 6.)

The waiver in the guaranty on the back of the note stated in part:

> Each of the undersigned waives every defense, counterclaim or setoff which any of them may now have or hereafter may have to any action by the holder in enforcing this guaranty....

(Columbia's exh. 4.)

The negative covenants in the Agreement that Morris relies on restrict Incorporated's ability to encumber its property, incur any indebtedness or enter into other agreements which restrict Incorporated's ability to comply with the Agreement (Findings, at 8). While the Agreement prohibits certain acts by Incorporated, Morris explicitly granted Columbia wide discretion "with respect to any matter whatsoever." Reading the entire document together, there is no contradiction and no ambiguity.

Morris also claims that even if the waiver is effective, Columbia must, as a matter of law, act in a commercially reasonable manner in dealing with the collateral.[4] Morris cites *United States v. Willis*, 593 F.2d 247, 255 (6th Cir.1979) to support her argument. *Cf. Federal Deposit Insurance Corpora-*

---

3. The *Hardt* court distinguished *Chicago Bridge* as involving a surety agreement, not a guaranty agreement. *Hardt*, 646 F.Supp. at 212 N. 2. However, the policy supporting the discharge of guarantors is the same as the policy which discharges sureties. Like a surety, a guarantor has right of subrogation upon payment of the principal's debt. Consequently, the guarantor receives the creditor's rights in the debtor's collateral. *Ford Motor Credit Co. v. Lototsky*, 549 F.Supp. 996, 998 (E.D.Pa.1982) (interpreting Pennsylvania law); *Mobil Construction Co. v.*

*Phoenix Ins. Co.*, 119 Ill.App.2d 329, 332–34, 256 N.E.2d 149, 151–52 (1st Dist.1970). Thus, if the creditor releases the collateral, the guarantor loses his right to that collateral and is injured. The guarantor, like the surety, should therefore be released *pro tanto*. *See* Restatement of Security § 82(g), § 132 (1941).

4. The question of a guarantor's waiver of good faith is distinguished from the question of commercial reasonableness and is dealt with below.

*tion v. Frank L. Marino Corp.*, 74 A.D.2d 620, 425 N.Y.S.2d 34 (N.Y.App.Div.2 1980) (Under New York common law secured party's duty to act with due diligence, reasonableness and care may not be disclaimed by agreement). *Willis*, however, is distinguishable and does not control this case. First, *Willis* was decided as a matter of federal law. *Id.* Second, and more important, *Willis* concerned a creditor disposing of collateral after the debtor's default. Third, another court in this district noted that *Willis* involved the federal government as a creditor and that possibly the government should be held to such a high standard. *National Acceptance Co. v. Wechsler*, 489 F.Supp. 642, 648 n. 7 (N.D. Ill.1980). However, in the context of a creditor disposing of property in accordance with Ill.Rev.Stat. ch. 26, ¶ 9–504(3) (1985), the *Wechsler* court refused to follow *Willis* where private creditors were involved. *Id.* at 648 n. 7. That same result here is mandated by Illinois law.

The waiver is clear and unambiguous and must be given effect according to its language. *Du Quoin State Bank v. Daulby*, 115 Ill.App.3d 183, 185–86, 450 N.E.2d 347, 349, 70 Ill.Dec. 874, 876 (5th Dist.1983); *Bank of Naperville v. Holz*, 86 Ill.App.3d 533, 537–38, 407 N.E.2d 1102, 1106, 41 Ill. Dec. 604, 608 (2d Dist.1980); *Jacobson v. Devon Bank*, 39 Ill.App.3d 1053, 1056–57, 351 N.E.2d 254, 256 (1st Dist.1976). We note that Illinois courts have held that guarantors who signed waivers with similar language have waived their rights. *See Exchange Nat'l Bank*, 41 U.C.C.Rep. Serv. at 897–98; *National Acceptance Co. v. Demes*, 446 F.Supp. 388, 391 (N.D.Ill. 1977); *Ishak*, 48 Ill.App.3d at 617, 363 N.E. 2d at 161–62, 6 Ill.Dec. at 632–33; *Jacobson*, 39 Ill.App.3d at 1056, 351 N.E.2d at 256. Consequently, we cannot say that the bankruptcy court was in error in finding that Morris waived her right to complain about Columbia's course of conduct in dealing with the Incorporated loan or by its releasing (by its inaction) its security interest in the accounts receivable.

**The Material Change Defense**

The bankruptcy court found that the "material change" defense had merit because the transfer of Incorporated's assets to Partners substantially increased Morris' risk and thus made it less likely that the Incorporated debt would be paid off. The bankruptcy judge found that the material change defense had the effect of returning Morris to the situation as of the date the material change occurred. This then resulted in Morris being discharged from interest, late charges and attorneys' fees subsequent to August 31, 1984 (Findings, at 17–18). Consequently, the judge found that Morris had equity in the properties of approximately 20% after subtracting the amount owed to Columbia, and he therefore denied Columbia's motion to modify the stay.

Columbia alleges that the bankruptcy court erred in applying the material change defense to this case. Columbia further argues that even if the material change defense is applicable, Morris waived her right to that defense. Morris counters that not only is the material change defense applicable to this case but that the bankruptcy court erroneously failed to discharge her from all her obligations under the guaranty.

The material change defense is available to guarantors because guarantors are only liable for the arrangements to which they agreed. *Alton Banking & Trust Co. v. Sweeney*, 135 Ill.App.3d 96, 101, 481 N.E.2d 769, 773, 89 Ill.Dec. 926, 930 (5th Dist. 1985); *see Scovill Manufacturing Co. v. Cassidy*, 275 Ill. 462, 473–74, 114 N.E. 181, 186–87 (1916). If the creditor and debtor-principal enter into an agreement which is materially different from that to which the guarantor agreed, and such change increases the risk on the guaranty, under Illinois law the guarantor is discharged. *Alton Banking*, 135 Ill.App.3d at 102, 481 N.E.2d at 773, 89 Ill.Dec. at 930; *McHenry State Bank*, 117 Ill.App.3d at 633, 454 N.E.2d at 348, 73 Ill.Dec. at 488; *Grundy County Nat'l Bank v. Cavanaugh*, 105 Ill.App.3d 718, 721, 434 N.E.2d 803, 806, 61 Ill.Dec. 448, 451 (3d Dist.1982).

Morris argues that a guarantor can be discharged due to material change in the

debtor's ability to pay the debt even if the creditor has not consented to the change. However, Morris has cited no cases, nor has this court found any Illinois cases, which discharge a guarantor where the material change is caused by the unilateral actions of the debtor. In fact, in all the cases cited above, the creditor in some way assented to the change situation. *Cf. Fulton Grain & Milling Co. v. Anglim,* 34 A.D. 164, 165, 54 N.Y.S. 632, 633 (1898) (unilateral action by debtor does not discharge guarantor).

In the two cases cited by the bankruptcy court, *Alton Banking and Bernardi Brothers, Inc. v. Great Lakes Distributing Inc.,* 712 F.2d 1205 (7th Cir.1983), the creditor participated in a change in the agreement between the creditor and debtor subsequent to the execution of the guaranty. For example, in *Alton Banking,* the creditor and debtor amended the financing agreement after the debtor changed the name of the automobile dealership and after the guaranty was signed. *Alton Banking,* 135 Ill.App.3d at 100, 481 N.E.2d at 772, 89 Ill.Dec. at 929. Similarly in *Bernardi Bros.,* the debtor and creditor entered into the security agreement after the debtor incorporated his business and after the guarantor signed the guaranty. *Bernardi Bros.,* 712 F.2d at 1206–07. *See also International Paper Co. v. Grossman,* 541 F.Supp. 1236, 1238 (N.D.Ill.1982), *aff'd mem.,* 725 F.2d 687 (7th Cir.1983) (creditor extended additional credit to new company which merged with company whose debts were guaranteed); [5] *Lawndale Steel Co. v. Appel,* 98 Ill.App.3d 167, 169, 174, 423 N.E. 2d 957, 960, 963, 53 Ill.Dec. 288, 291, 294 (2d Dist.1981) (creditor and debtor agreed on price increase subsequent to signing of guaranty); *Claude Southern Corp. v. Henry's Drive-In, Inc.,* 51 Ill.App.2d 289, 295, 201 N.E.2d 127, 130 (1st Dist.1964) (agreements entered into following execution of guarantees).

A case almost a century old, *Richter v. Frank,* 41 F. 859 (C.C.N.D.Ill.1890), illustrates the point that the creditor must acquiesce in a change which imperils the guarantor. In *Richter,* the principal agreed to sell stock in a company to the plaintiff on the condition that at a future time the plaintiff could elect to resell that stock back at a higher price. The defendant guaranteed the principal's performance. Without the plaintiff's consent, the company sold all its assets to another company. Both the principal and guarantor, however, voted to approve the transfer of assets. When the principal refused to pay the agreed-upon price for the resale of the stock, the plaintiff sued the guarantor. *Id.* at 859–60. The guarantor argued that the transfer of assets materially altered the contract between the plaintiff and the principal and consequently he should be discharged. *Id.* at 860. The court refused to discharge the guarantor relying on the fact that the plaintiff never consented to nor was a party to the transfer. *Id.*[6]

Thus the test in Illinois appears to be that in order for the guarantor to be discharged the material change must be in the creditor-debtor relationship which is the basis for the guaranty, and must be with the creditor's consent. Such consent may be explicit such as where the debtor-creditor agreement is modified without the guarantor's consent. *See Alton Banking,* 135 Ill.App.3d at 100, 481 N.E.2d at 772, 89 Ill.Dec. at 929. A guarantor may also be discharged where the creditor implicitly consents by extending new credit to the debtor with knowledge of the material change. *See International Paper,* 541 F.Supp. at 1241.

The material change defense in state guaranty and surety law is difficult to pigeonhole into broad conceptual categories since the legal outcomes turn upon specific

---

**5.** *International Paper* was decided under New York law because the Illinois choice of law rules indicated that New York substantive law should be applied. However, the court stated that there was no difference between New York and Illinois law concerning whether the guarantor

was liable on the guarantees. *International Paper,* 541 F.Supp. at 1240–41, 1241 n. 3.

**6.** Even though the guarantor voted for the asset transfer, the court explicitly stated that it was not basing its holdings on those actions. *Richter,* 41 F. at 860–61.

## 784

factual determinations regarding ongoing business relationships. Applicable rules of law are not fairly reduced to isolated language in prior state court decisions. The bankruptcy court intelligently discerned the principles involved, yet the decision was dealt with on an expedited basis in the face of hard equitable circumstances. This court is unsure of its own footing in regard to Morris' claim against Columbia, but it does not understand the facts to be the type appropriate for the material change defense. While Columbia's conduct might release some of Morris' obligation on the guaranty—which is discussed *infra* on the issue remanded—the picture which emerges from the hearing transcript and documentation on appeal does not lend itself to an interpretation that Columbia altered Incorporated's obligation as a principal so that the law would release Morris from the guaranty.

■ The bankruptcy court found that while the transformation of Incorporated into Partners materially increased the risk on Morris' guaranty, Columbia neither "expressly nor implicitly consent[ed] to the transfer of assets" Findings, at 9). If it is true that Columbia did not consent to that which increased Morris' risk, the material change defense would be inapplicable. A fair reading of the bankruptcy court's finding indicates that Columbia did not consent *prior* to transfer, but this leaves open the question of implicit consent after realizing that the transfer occurred.[7] Such implicit consent was found in *International Paper*, where the bank extended further credit in full knowledge of the alterations. The material change defense inquiry must therefore focus upon whether Columbia's actions at some time following the transfer could have constituted implicit consent to an alteration which injured Morris' interest.

Morris argues that since Incorporated's transfer of assets, failure to provide Columbia with financial reports and encumbrance of new debts, were all in violation of its restrictive covenants, Columbia must have consented to these alterations. However, all that Columbia could have done under the circumstances would have been to accelerate the loan and declare a default. At that time neither Incorporated nor Partners had generated any receivables and there was not enough working capital to cover the loan. Therefore Columbia would still have looked to the Morris properties to satisfy the outstanding obligation. Such a move would not have served anyone's interest, least of all that of Morris.

Instead, Columbia delayed declaring default—which was its option under the Agreement—while the business received an influx of new money from the limited partner and the Midwest loan. The bankruptcy court properly stated that Columbia's action with respect to these efforts was commercially reasonable. We do not understand Columbia to have thereby consented to an alteration of Incorporated's obligation by its decision not to accelerate the loan at the moment it discovered the further business dealings of the principal. Nothing in the language of the guaranty would indicate that Columbia was required to do so. Nothing in the law of guaranty would indicate that Columbia's refusal to accelerate the loan operated to release Morris from the guaranty. *See* 38 C.J.S. *Guaranty* Section 72 ("An indulgence or act of leniency on the part of the guarantee toward the principal which does not change the rights and duties of the parties does not constitute such an alteration as will release the guarantor").

Because the court does not understand Columbia's action to constitute consent to a material alteration in Incorporated's obligation which increased the risk on the guaranty, we need not address the issue of Morris' waiver of that defense, which was neither argued below nor addressed by the bankruptcy court.

**7.** At the end of the hearing, the bankruptcy judge found that "the bank certainly did learn enough at some point to know that the negative covenants [in the loan agreemnt] could well have been breached." The record also suggests that subsequent to Incorporated's transfer of assets to Partners, Columbia may have become aware that Incorporated entered into the partnership. *See, e.g.,* Record, June 18, 1986, at 18–20 (Columbia's President given a check on which Partners was remitter).

## Columbia's Good Faith

█ In resolving the question of Morris' guaranty defenses the proper inquiry focuses upon the actions of Columbia rather than the possibly fraudulent conduct of Morris' business associates. Since Columbia did not have knowledge of the fact that the business transaction practically eliminated Morris' interest in the enterprise, it cannot be held responsible for that conduct. Nor is there evidence upon which this court can blame the bank for the failing enterprise itself. Instead, the court looks to whether the bank acted to the injury of Morris' interests in violation of the duty it owed to her as a guarantor.

Irrespective of the waivers in Morris' contract, we believe as a matter of law that Illinois courts would imply an obligation of good faith in this case. *See St. Charles Nat'l Bank v. Ford,* 39 Ill.App.3d 291, 295, 349 N.E.2d 430, 434 (2d Dist.1976) ("the contract of suretyship imports entire good faith and confidence between the parties in regard to the whole transaction ..."). Although we stated previously that the Uniform Commercial Code may not control this case, from a policy standpoint it makes no sense to imply good faith in cases of negotiable instruments (with fixed interest rates) and not to imply good faith because a note is non-negotiable.

Because good faith conduct is not waivable, the bankruptcy court should determine on remand if any of Columbia's actions or inactions were not in good faith.[8] In re-

viewing the facts, the bankruptcy judge should consider the legal obligations of creditors to guarantors, whose interests obviously run counter to both creditor and debtor. Although the creditor does not have a fiduciary relationship with respect to the guarantor, *Farmer City State Bank v. Guingrich,* 139 Ill.App.3d 416, 423, 487 N.E.2d 758, 763, 94 Ill.Dec. 1, 6 (4th Dist. 1985), we believe the *Barrett* court stated the standard of conduct to which creditors are held:

> [I]f a person to whom a guaranty is made does any act which injures the guarantor or is inconsistent with his rights, or if such person fails to do an act enjoined upon him and such omission injures the guarantor, the latter is discharged to the extent of such injury.

*Barrett,* 382 Ill. at 440, 47 N.E.2d at 484. Illinois has recognized that such obligations may include the duty, under some circumstances, "in the spirit of good faith dealing to inform [the guarantor] of circumstances which materially increase [the] risk as guarantor." *McHenry State Bank,* 454 N.E.2d at 349, 73 Ill.Dec. at 489.[9] We think that the threshold for finding that Columbia did not act in good faith amounts to the same standard as fraudulent conduct.

The record is not devoid of facts which might indicate bad faith. What is most troubling to the court is the evidence indicating that Acme, one of Columbia's favored clients, furnished collateral on the loan, and that Columbia stalled on the de-

8. The bankruptcy judge's finding that Columbia acted with commercial reasonableness with respect to the collateral forecloses a finding of bad faith with respect to the impairment defense. However, the judge did not deal with the issue of Columbia's good faith obligations toward Morris as guarantor on the loan.

9. Illinois courts have not addressed any cases where a creditor was found to be dealing in bad faith because it did not inform a guarantor of factors which materially increased the risk on the guaranty. One federal court interpreting New York law held that the credit violated its good faith duty by misrepresentations made to a guarantor on the guarantor's inquiry. *Chemical Bank v. Layne,* 423 F.Supp. 869 (S.D.N.Y.1976). Another federal court, also interpreting New York law, held that the good faith duty on creditors could be violated by non-disclosure

only if there was clear and decisive evidence indicating bad faith, amount to fraudulent concealment. *Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1286 (S.D.N.Y.1979). The fraud standard is consistent with New York's rule that a guarantor cannot waive the right to complain against the creditor's fraud. *See Federal Deposit Insurance Corporation v. Frank L. Marino Corp.,* 425 N.Y.S.2d 34, 74 A.D.2d 620 (N.Y.App.Div. 2 1980).

A Columbia official explained at the hearing his assumption that Morris, as a 40% shareholder in Incorporated, was fully aware of the business transactions. On remand, the bankruptcy court should determine whether this assumption was reasonable in light of the facts known to Columbia, and in light of Columbia's obligations to Morris as a guarantor.

fault until Acme was able to sell the collateral to Partners for $85,000. Such a transaction raises the inference that Columbia allowed Incorporated to release an additional $85,000 from its operating budget at a time when it knew that the company was having financial problems. Perhaps more important, if the bank allowed a favored customer to substantially reduce its liability with respect to the Incorporated loan at a time when it expected to declare a default, but did not even inform Morris of Incorporated's problematic condition, Columbia might have acted in bad faith towards Morris as a guarantor on the note. We cannot presume to resolve the factual dispute over this issue, and we recognize that there is evidence which supports both sides. We therefore remand to the bankruptcy judge to determine whether Columbia acted in bad faith to the detriment of Morris as a guarantor. If such a finding is in order, the bankruptcy court should determine the extent of injury, and Morris' obligation should be released to that extent.

## CONCLUSION

For the reasons stated in this opinion, we affirm the bankruptcy court in finding that Columbia did not impair Morris' rights with respect to Incorporated's (later Partners') collateral. We reverse the court concerning Morris' material defense claim and remand for reconsideration not inconsistent with this opinion.