BAY STATE MILLING COMPANY, a Minnesota Corporation, Plaintiff–Appellee,

v.

William W. MARTIN, Sr., a resident of the State of Illinois, Defendant–Appellant,

and

Philip R. Sylvester and National Flour Company of Wisconsin, Inc., a Wisconsin Corporation, Defendants–Appellees.

No. 89–1336.

United States Court of Appeals, Seventh Circuit.

Argued May 7, 1990.

Decided Oct. 22, 1990.

---

Michael L. Chernin, Milwaukee, Wis., for plaintiff-appellee.

Saul R. Leibowitz, Chicago, Ill., Michael S. Polsky, Trebon & Polsky, Milwaukee, Wis., for defendants-appellees.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

Bay State Milling Company ("Bay State"), a seller of baking goods and supplies for resale, sued William W. Martin, Sr., Philip R. Sylvester, and National Flour Company of Wisconsin, Inc. ("National Flour Wisconsin"), a wholesale distributor of baking products, for failing to pay for delivered product pursuant to a guaranty signed by Martin and Sylvester. Martin denied liability; Sylvester admitted liability, and cross claimed against Martin for intentional deceit, strict responsibility and negligent misrepresentations (see Wis.J.I. Civil §§ 2401, 2402, and 2403, respectively) made in the sale of National Flour Wisconsin from Martin to Sylvester, as well as for Martin's conversion of National Flour Wisconsin funds to pay creditors of Martin's company, National Flour Company, Inc. ("National Flour"). There was complete diversity among the parties and Wisconsin law controlled. A jury awarded Bay State $447,528.36 for Martin's breach of guaranty, and awarded Sylvester $50,000 for Martin's intentional deceit misrepresentations, $25,998.27 for Martin's conversion, and $70,025.79 in punitive damages. Martin appeals; we affirm the jury verdict.

---

\* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, sit-

## I.

In 1980, Sylvester went to work for Martin as a salesman for National Flour which at the time had a Wilmette, Illinois and a Milwaukee, Wisconsin division; Martin was its sole shareholder. In 1982, after working at the Milwaukee division, Sylvester approached Martin about acquiring an interest in National Flour. Martin provided Sylvester with financial statements dated August 31, 1982 and September 30, 1982, and with the September 30, 1982 financial statement of Country Maid Bakery Company, Inc. ("Country Maid"), a business Martin also owned. These documents together overstated the amount National Flour's Milwaukee division was owed and understated the amount the division owed others. Sylvester, untrained at reading financial documents, showed the papers to his family, who were providing the capital for his purchase. After consultation and in reliance on the information Martin provided, Sylvester decided to invest.

In January 1983, National Flour Wisconsin was formed: Sylvester paid Martin $60,000 to become a 50% shareholder in the new company, while National Flour purchased the other 50% with the assets of its Milwaukee division. Sylvester believed that the $60,000 would be loaned back to the new company. Martin retained responsibility for maintaining the books of both National Flour and National Flour Wisconsin, while Sylvester primarily managed the sales of National Flour Wisconsin.

In August 1983, apparently due to problems in obtaining payment from National Flour Wisconsin for shipped product, Bay State, a credit customer of National Flour Wisconsin, required a personal written guaranty for full and prompt payment of indebtedness from Sylvester and Martin. The guaranty read in part:

> This guaranty shall continue in full force and effect until such time as you shall receive from the undersigned written notice of revocation, and such revocation

ting by designation.

shall not in any way relieve the undersigned from liability for any indebtedness incurred prior to the actual receipt by you at your office at 1776 Heritage Drive, North Quincy, Massachusetts, of such notice; and the registry return receipt card shall be the best evidence thereof.

Immediately below this, written in hand at Martin's bequest and added by Thomas Kraut, Bay State's then Treasurer and Credit Manager, the guaranty read:

The day either partner/owner is no longer financially involved with this corporation, and with due notice to Bay State Milling Co as above, said party is no longer a guarantor.

Martin and Sylvester both signed the guaranty.

In February 1985, Sylvester wanted either to sell his share of National Flour Wisconsin back to Martin or to buy out Martin's share; Martin offered to sell. An agreement was reached whereby Sylvester, via National Flour Wisconsin, was to buy Martin's 50% share for $40,000. That share was ultimately purchased from Country Maid, which had at some time previously acquired Martin's 50% share, even though the original agreement between Martin and Sylvester prohibited such transfers without both partners' consent. At the time of Sylvester's purchase from Country Maid, Martin did not provide Sylvester with much financial information, saying that he, Martin, would turn over the books of National Flour Wisconsin when Sylvester bought him out. Martin had, however, just months before, asserted that National Flour Wisconsin had received a $10,000 credit from the Internal Revenue Service (IRS). He also had asserted that the money National Flour Wisconsin paid to buy out his remaining interest would go toward paying down the mounting debt owed Bay State. Although the sale and an initial payment of $20,000 was made, the stock was never actually transferred, and the total purchase price never tendered.

On March 1, 1985, after the sale of his share in National Flour Wisconsin, Martin allegedly sent a letter to Bay State notifying it that he was no longer associated with National Flour Wisconsin and was no longer a guarantor. There was testimony that Bay State did not receive this letter until December 1985 or January 1986, and that the company had no knowledge of the letter before October 24, 1985. The last shipment from Bay State to National Flour Wisconsin apparently occurred on October 9, 1985.

But when Sylvester took control of the business, he found that its financial picture was not as rosy as Martin had led him to believe. Checks drawn on National Flour Wisconsin's account had been used to pay the tax obligations of National Flour, and other monies had gone either to pay in full or in part National Flour's obligations to various companies, some of which had had no dealings with National Flour Wisconsin whatsoever. Still other checks, issued by National Flour Wisconsin, were returned for insufficient funds, and tax liens were placed on the company's accounts. An outstanding tax liability of $25,998.27 from previously unpaid balances, apparently through March 17, 1986, was assessed against National Flour Wisconsin and Sylvester personally. An unpaid balance of $411,943.68 was also due Bay State, which in August of 1985, brought this action to enforce the guaranty signed by Martin and Sylvester.

Bay State's complaint sought payment from Martin, Sylvester, and National Flour Wisconsin for the account's unpaid balance plus interest. Martin answered that his letter announcing the end of his financial involvement with National Flour Wisconsin terminated his role as guarantor, not only for all obligations accruing after the alleged March mailing date, but for all previously incurred obligations as well. Sylvester admitted his liability to Bay State under the terms of the guaranty, and cross-claimed against Martin for his misrepresentations which had induced Sylvester to form and later buy out National Flour Wisconsin. Sylvester also sought damages for monies wrongfully converted to Martin's own use and for punitive damages.

Judge Warren granted summary judgment in favor of Bay State based on the clear meaning of the guaranty, holding that Martin was liable to Bay State for National Flour Wisconsin's obligations. A trial was then held, limited to damages arising from Martin's guaranty to Bay State and to the merits of, and possible damages attributable to, Sylvester's cross-claims against Martin.

At the close of trial, the jury received instructions and was provided a 21 question special verdict form, asking whether Martin's letter to Bay State was ever received, whether Martin had made misrepresentations to Sylvester inducing him to suffer pecuniary damage under a theory of either intentional deceit, negligence or strict responsibility, whether Martin had converted funds belonging to National Flour Wisconsin to his own use and whether Martin was to be required to pay punitive damages. After deliberations, the jury determined that Martin's letter was never received, and awarded Bay State damages of $447,528.36 (the ending balance of $411,943.68 that National Flour Wisconsin owed Bay State for shipments through October 9, 1985, plus interest). The jury also found that Martin had intentionally misrepresented the financial condition of his company, National Flour, and the condition of National Flour Wisconsin at the time of the second sale, resulting in damages to Sylvester of $50,000. The jury further found that Martin had converted funds in the amount of $25,998.27, and the jury awarded punitive damages of $70,025.79.

On appeal, Martin claims that summary judgment in favor of Bay State should never have been granted, that at the close of evidence his motion for directed verdict should have been granted and that the jury's verdict was unsupported by the evidence. As discussed below, Martin's arguments are unavailing, and while the testimony and exhibits in this case were, at least potentially, confusing to the jury, the jury's award is ultimately in accordance with law and supported by the evidence.

## II.

With respect to his liability to Bay State, Martin argues that the granting of summary judgment on the meaning of the guaranty was improper and that evidence should have been adduced to determine the intent of the handwritten portion of the document. As to liability to Sylvester, Martin argues that he was entitled to a directed verdict, that there was insufficient evidence to show he intentionally misrepresented the companies' finances, that the discrepancies in certain figures were not material, that there was no reliance on his representations and that he did not improperly convert any funds. Martin further argues that punitive damages should not have been imposed. Martin argues that punitive damages cannot stand when compensatory damages are inappropriate, but he does not contest the amount, as such, of the punitive damages imposed. These arguments will be addressed in turn.

### A. Summary Judgment

A grant of summary judgment is reviewed *de novo* in this court, which must determine, viewing all inferences in favor of the non-moving party, whether any genuine issue of material fact exists; a party bearing the burden of proof on a particular issue who wishes to raise an issue of material fact must affirmatively demonstrate such fact and may not simply rest on his pleadings. *Patrick v. Jasper County*, 901 F.2d 561, 564–66 (7th Cir.1990).

The district court granted Bay State's motion for summary judgment, finding that no genuine issue of material fact existed. The court found that there was no need to go outside the four corners of the document to determine its meaning. Martin urges this court, as he did the district court, to interpret the document in a way that seems irrational and that renders the document's protections to Bay State virtually meaningless. Martin claims that upon renunciation of his interest in National Flour Wisconsin, he was not only excused from liability for any future obligations the company might incur, but was also excused from liability for all past obli-

gations. Martin claims that this interpretation follows from the handwritten portion of the guaranty and that, failing this reading, the handwritten portion has no meaning at all.

To the contrary, the handwritten portion references the typed portion above it, which explicitly states that notification does not "relieve the undersigned from liability for any indebtedness incurred prior to the actual receipt [thereof]." The handwritten portion may simply have the effect of making explicit that one guarantor may be relieved from future liability without revoking the entire guaranty, or might simply provide explicitly for the contingency of a partner's leaving the company, something not expressly mentioned in the typed portion of the document. Martin did not provide factual evidence to support his reading of the handwritten passage and, perhaps significantly, did not seek to provide the affidavit of Thomas Kraut, who had included the handwritten language at Martin's request. Upon consideration of this issue, we agree with the district court that no additional evidence was needed to determine what was clear on the face of the document.[1]

## B. Directed Verdict

■ Martin next asserts that his motion for directed verdict was wrongly denied. On review of motions for directed verdict, this court must consider whether any evidence exists upon which a jury could properly proceed to a verdict, taking all inferences in favor of the non-moving party.

*Warrington v. Elgin, Joliet & Eastern Rwy. Co.*, 901 F.2d 88, 89–90 (7th Cir.1990). As we discuss below, there was more than ample evidence to go to the jury, making the denial of Martin's directed verdict motion proper.

## C. Sufficiency of the Evidence to Support the Jury's Verdict

As the Wisconsin Supreme Court has stated,

[i]n reviewing a jury's verdict, the test is whether there is *any* credible evidence in the record on which the jury could have based its decision. The evidence is viewed in the light most favorable to sustain the verdict; we do not look for credible evidence to sustain a verdict the jury could, but did not reach. *Sumnicht v. Toyota Motor Sales*, 121 Wis.2d 338, 360, 360 N.W.2d 2 (1984) (emphasis added), citing with approval *D.L. v. Huebner*, 110 Wis.2d 581, 634, 329 N.W.2d 890 (1983); sec. 805.14(1), Stats.

*Lundin v. Shimanski*, 124 Wis.2d 175, 184, 368 N.W.2d 676, 681 (1985). Further, "[i]t is well-settled in this circuit that 'a jury verdict will not be set aside if a reasonable basis exists in the record to support that verdict.' " *Knapp v. Whitaker*, 757 F.2d 827, 843 (7th Cir.1985) (quoting *Spesco v. General Electric Co.*, 719 F.2d 233, 237 (7th Cir.1983)); also *Foster v. Continental Can Corp.*, 783 F.2d 731, 735 (7th Cir.1986) ("a jury verdict must be accorded great deference.") We will address each of Martin's allegations of deficiency in the jury verdict in turn.[2]

1. The district court's order granting summary judgment mentioned in a footnote that the date Bay State actually received Martin's letter was not critical because all the debt involved was incurred prior to the earliest date Martin allegedly sent the letter. While there may be some doubt that this is the case, there is no question that the bulk of the debt owed Bay State was incurred prior to March of 1985. In any event, the exact date is of little consequence given the jury's finding that the letter was not received prior to Bay State's last product shipment to National Flour Wisconsin on October 9, 1985.

2. As an initial comment on appellant's arguments in this court regarding the evidence presented to the jury at trial, we note that Martin's arguments are not infrequently without

support in the record. As an example of this serious deficiency, we note Martin's first two arguments with respect to lack of support for the jury's decision. Martin asserts (Appellant's Br. pp. 17–18) that there was never any testimony that Martin told Sylvester that Martin would loan back to the company Sylvester's initial $60,000 capital investment in National Flour Wisconsin, citing transcript pages 526–27. However, at transcript page 528, Sylvester was asked, "Q: And it was your understanding that Mr. Martin or National Flour, Inc., Illinois, was supposed to loan that $60,000 back to Wisconsin? A: That's correct." Martin then asserts (Appellant's Br. p. 21) that Sylvester never testified that he relied on the 1982 Country Maid balance sheet in reaching his decision to buy into National Flour, and could not therefore

## 1. Intentional Deceit Misrepresentations

The elements of a claim for intentional misrepresentation are well settled in Wisconsin:

> first, there must be a false representation of fact; second, it must be made with intent to defraud and for the purpose of inducing another to act upon it; third, such other person must rely on it and thereby be induced to act, to his own injury or damage. *See Williams v. Rank & Son Buick, Inc.*, 44 Wis.2d 239, 242, 170 N.W.2d 807 (1969), and *Goerke v. Vojvodich*, 67 Wis.2d 102, 107, 226 N.W.2d 211 (1975). "In intentional deceit the defendant must either know the representation is untrue or the representation was made recklessly without caring whether it was true or false ..." *Whipp v. Iverson*, 43 Wis.2d 166, 169, 168 N.W.2d 201 (1969), quoted in *Ollerman v. O'Rourke Co., Inc.*, 94 Wis.2d 17, 25, 288 N.W.2d 95 (1980). The party alleging the fraud has the burden of proving the elements by clear and convincing evidence. *Williams*, 44 Wis.2d at 242 [170 N.W.2d 807].

*Lundin*, 124 Wis.2d at 184, 368 N.W.2d at 680–81.

■ In general, a false representation must relate to present or pre-existing events or facts and may not be merely a prediction of future events or an unfulfilled promise; however, a promise may be actionable when there is no present intent to perform that promise and a prediction may be actionable when there are known existing facts incompatible with that prediction. *Matter of Gryzynger*, 29 B.R. 992, 994–95 (W.D.Wis.1983) (citing *Hartwig v. Bitter*, 29 Wis.2d 653, 139 N.W.2d 644, 646 (1966)); see also *Lundin*, 124 Wis.2d at 192, 368 N.W.2d at 684. A misrepresentation further need not be conveyed by words, but may be conveyed by actions as well:

> "[i]t is not necessary for a person to make oral misrepresentation[s] of fact in order to be guilty of fraudulent conduct, —such representations may be made by the acts or conduct of the party. The rule is stated in 1 Bigelow, Fraud, p. 467: 'any conduct capable of being turned into a statement of fact is a representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts.'" *Scandrett v. Greenhouse*, 244 Wis. 108, 113, 11 N.W.2d 510 (1943), cited with approval in *Goerke v. Vojvodich*, 67 Wis.2d at 106–07 [226 N.W.2d 211].

*Lundin*, 124 Wis.2d at 185–86, n. 5, 368 N.W.2d at 681.

The jury instructions provided in this case were taken almost verbatim from Wisconsin's pattern jury instructions and properly set out the elements of each of appellant's and cross-appellant's claims.[3] However, as Martin argues, the specific instances of tortious conduct listed in the instructions do not all appear to be actionable as fraudulent misrepresentations. The jury instructions stated in pertinent part:

> Questions 8, 9, and 10 relate to Philip R. Sylvester's claim that William W. Martin, Sr. deceitfully misrepresented facts to him. The burden of proof is on Philip R. Sylvester to convince you to a reasonable certainty, by evidence that is clear, satisfactory, and convincing, that questions 8 and 9 should be answered "yes." There are five elements that must be proved by

---

claim that he relied to his detriment on the apparent circumstance that the Milwaukee division of National Flour was owed $59,000. However, at transcript pages 510–13, Sylvester stated that Martin had informed him of this outstanding obligation that Country Maid owed National Flour. It was after considering this financial information that Sylvester decided to buy into Martin's company: "Q: At the time Mr. Martin gave this to you, did he say whether the $59,000 obligation that appears on this statement was an asset of National Flour, Milwaukee Division? A: Yes." Transcript at 513.

3. The elements of an intentional deceit misrepresentation in Wisconsin are, first, that the defendant made a representation of fact, second, that the representation was untrue, third, that the representation was made knowing it to be untrue or recklessly not caring whether it was true or false, fourth, that the representation was intended to deceive plaintiff and make plaintiff act to plaintiff's pecuniary damage, and fifth, that the plaintiff believed that representation to be true and relied upon it. Wis.J.I.Civil § 2401 (1969).

Philip Sylvester. First, that William W. Martin, Sr. made one or more of the following representations of fact:

a) that National Flour Company would apply the money which it received from National Flour Company of Wisconsin, Inc. in reduction of the indebtedness due Bay State Milling Company;

b) that the financial statements which he gave to Philip R. Sylvester were true and correct;

c) that all tax obligations of National Flour Company of Wisconsin, Inc., through December 31, 1984, had been paid and that the corporation had a $10,-000 credit with the IRS;

d) that all loans from National Flour Company of Wisconsin, Inc. to William W. Martin, Sr. or any companies controlled by William W. Martin, Sr. would be paid one year from the date of the closing of the stock transactions;

e) that William W. Martin, Sr. had wrongfully made the following transfers of funds without any consideration from National Flour Company of Wisconsin, Inc. to National Flour Company of Illinois, Inc., a corporation controlled and owned by William W. Martin, Sr. and his family:

| DATE | CHECK # | AMOUNT |
| --- | --- | --- |
| 2/16/83 | 5309 | $ 1,661.29 |
| 2/16/83 | 5310 | $ 2,840.00 |
| 2/16/83 | 5311 | $ 4,599.50 |
| 4/25/83 | 5473 | $ 3,631.99 |
| 8/05/83 | 5690 | $25,000.00 |
| 5/15/84 | 6301 | $ 5,000.00 |
| 5/15/84 | 6288 | $ 5,000.00 |
| TOTAL | | $47,732.78 |

f) that on August 30, 1983, William W. Martin, Sr. transferred the sum of $9,244.00 from National Flour Company of Wisconsin, Inc. to the Internal Revenue Service to pay the obligations of National Flour Company of Illinois, Inc.;

g) that on November 9, 1983, William W. Martin, Sr. transferred the sum of $3,000.00 from National Flour Company of Wisconsin, Inc. to the Internal Revenue Service in payment of the obligations of National Flour Company of Illinois, Inc.;

h) that on November 3, 1983, William W. Martin, Sr. transferred the sum of $6,002.76 from National Flour Company of Wisconsin, Inc. to Anderson Clayton in payment of certain obligations of National Flour Company of Illinois, Inc.; and

i) that on February 24, 1984, William W. Martin, Sr. transferred the sum of $4,046.25 from National Flour Company of Wisconsin, Inc. to Anderson Clayton in payment of certain obligations of National Flour Company of Illinois, Inc.

Although Wisconsin appears to liberally construe certain conduct as a misrepresentation and makes certain representations of non-pre-existing fact actionable, it appears that only paragraphs b) and c), above, unquestionably constitute misrepresentations of fact. Items a) and d) appear to be non-actionable promises, and e) through i), while possibly conduct constituting misrepresentations under Wisconsin law, appear to involve some otherwise actionable tortious conduct such as a conversion. Primarily for two reasons, we think it unnecessary to rigorously pursue these distinctions here.

■ First, while Martin originally offered his own set of jury instructions from "Federal Jury Practice and Instructions (Devitt, Blackmar and Wolff) No. 83.01 as modified" it is not clear from the record that he properly objected to paragraphs a) through i), above, so as to preserve his right to appeal the appropriateness of their inclusion. In fact, Martin's own proposed Instruction No. 11 includes, as two of the "misrepresentations" at issue in this case, whether Martin represented to Sylvester that he would apply money received from National Flour Wisconsin to reduce that company's indebtedness to Bay State (a future promise), and whether Martin failed to disclose certain alleged misapplications of the funds of National Flour Wisconsin to the debts of National Flour (conduct possibly constituting a misrepresentation under Wisconsin law but more clearly constituting a conversion). Martin's failure to properly object to jury instructions waives his opportunity to put them in issue here.

Second, as the Wisconsin Supreme Court stated, "[w]e are not bound on [ ] appeal by [ ] findings and conclusions unfavorable to respondent, but may properly review the whole case and affirm the judgment though errors be found, if, notwithstanding, the judgment be right on the pleadings and the evidence." *Lundin*, 124 Wis.2d at 189, n. 8, 368 N.W.2d at 683 (quoting *State v. Alles*, 106 Wis.2d 368, 391, 316 N.W.2d 378 (1982)). While some of the alleged derelictions may not have constituted actionable misrepresentations, the jury had only to find that Martin made "one or more of the following representations of fact," causing Sylvester to rely to his pecuniary damage. Under this instruction, liability presumably could be established on the basis of any one of the misrepresentations. The jury might also consider the other acts or statements for purposes of determining compensatory damages although some of the other acts, even those that were clearly tortious, could not qualify strictly as misrepresentations of fact. These improper acts, which may have been inaccurately characterized, may have amounted to conversion (with respect to which the jury also found Martin liable) or some similar tort involving misapplication of funds. In hindsight, the jury instructions should have been drawn with greater precision. Further, we believe they were at least partially in error. But we conclude that the amounts listed as improperly applied were well supported in the record, and the jury could properly consider those amounts in reaching its verdict. In other words, characterizing the financial improprieties as "misrepresentations" did not result in substantial injustice.[4]

### 2. *Conversion*

Martin's most persuasive argument on the impropriety of the jury's damage award involves the question of conversion, with respect to which the jury awarded precisely the amount of the IRS's tax assessment against Sylvester and National Flour Wisconsin and specifically referred to the tax assessment exhibit by number. Scrutiny of that exhibit suggests that it covered a period through and including March 17, 1986, extending beyond the time that Martin was affiliated with National Flour Wisconsin. The evidence adduced throughout the trial suggests that Martin repeatedly converted National Flour Wisconsin funds, using those funds to pay the tax liabilities of his own company, National Flour. Martin repeatedly failed to pay the tax liability of National Flour Wisconsin and there is no way to account precisely for the money from National Flour Wisconsin misapplied by Martin during the time he kept its books. Absent more definitive evidence, we believe that the jury's use of the final tax assessment levied against National Flour Wisconsin and Sylvester individually was a reasonable approximation of the funds misapplied and reflected the amount needed to make Sylvester whole. It is true that the period covered by the tax assessment included time when Martin was no longer with National Flour Wisconsin. But there is no indication that the liability reflected by that assessment was not the result of Martin's earlier misuse of funds intended to meet the tax liabilities of National Flour Wisconsin. These funds were used, instead, to meet the tax obligations of National Flour. Absent any indication that Sylvester failed to pay his taxes after Martin left National Flour Wisconsin, we find that the amount of the IRS assessment approximates the damages caused by Martin.[5]

### 3. *Punitive Damages*

Finally, although the matter was not raised by the parties, we note that the

---

4. We are satisfied that the jury awarded no damages specifically attributable to paragraphs a) and d) of the jury instructions, which we have characterized as promissory.

5. We have some concern that certain of the damages included in the special verdict answer to the question on conversion may have represented double counting. Thus, the damages awarded for paragraphs f) and g) may have resulted in a relatively minor windfall for Sylvester. While it is certainly not clear that this was the case, the issue was not raised and is accordingly waived.

jury apparently transposed on the special verdict form the amount for punitive damages and the sum for compensatory damages. In cumulating the damages allegedly flowing from Martin's "misrepresentations" listed in the jury instructions paragraphs e) through i), we note that the total equals exactly $70,025.79, the amount the jury awarded as *punitive* damages. On the other hand, the jury awarded $50,000 as compensatory damages against Martin in favor of Sylvester. Such an apparent mechanical error in transposing compensatory and punitive damages is not fatal to the verdict. See, e.g., *Big John, B.V. v. Indian Head Grain Co.*, 718 F.2d 143, 150 (5th Cir.1983). In any event, the compensatory damages awarded for Martin's intentional deceit misrepresentations and for conversion, and the amount awarded as punitive damages, all find a reasonable basis in the record.

### III.

For the reasons stated, the order of the district court is

AFFIRMED.