FARMERS STATE BANK OF HOFFMAN, Plaintiff-Appellant, v. LLOYD SCHULTE *et al.*, Defendants-Appellees.

Fifth District   No. 5—91—0440

Opinion filed February 11, 1993.

Sharon S. Costa, of Mt. Vernon, for appellant.

George C. Lackey, of Lackey & Lackey, P.C., of Centralia, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

Plaintiff sued defendants to collect on a promissory note signed by defendants. The trial court granted a directed verdict in defendants' favor, and plaintiff appeals. We reverse and remand.

Jodi Erlinger and her husband, Brad Erlinger, sought to purchase a business known as the Hoffman House from Brad's parents. The purchase price of the business was $53,000, but after other loans of Brad and Jodi were consolidated with this loan, the total loan amount became $70,500. This loan, as evidenced by "note #1," indicated that security for the loan was a mortgage on Hoffman House. There was also typed at the very bottom of the note:

> "Also the following titles:
>     1986 Harley-Davidson Motorcycle #1HD4CAM18GY116008
>     1979 Datsun B 210 Coupe #KHLB310007830
>     1979 Ford Mustang #9FO3T300457
>     UCC-1 filed on all inventory, equipment, fixtures and machinery of Hoffman House."

The loan arrangement was set up in a somewhat peculiar manner. Note No. 1 was a promissory note for $33,000, but it stated that the total loan amount was $70,500. There were three promissory notes for $12,500 each signed respectively as follows: Brad, Jodi, and Helen Erlinger as borrowers; Brad, Jodi, and Jim and Freida Erlinger as borrowers; and Brad and Jodi Erlinger, and Lloyd and Eva Schulte, defendants in this cause, as borrowers. Each of these notes indicated that payment was to be made "as per note, number one, dated 3-17-87." These notes made no other reference to note No. 1 and did not list any security for the loans, except for a paragraph that indicated that the note was secured by a mortgage dated the same date as the note.

Note No. 1 indicated that the payment schedule of $692.06 per month was set up over 35 months with a "balloon payment" of $67,422.72. Since the note listed the yearly rate of interest to be 10.5% and a balance owed at the end of the note of $67,422.72, it is obvious that the monthly payment included principal and interest for all of the notes for the entire $70,500 and not just the $33,000 face amount of note No. 1.

All of the parties agreed that there was intended to be a security interest in the equipment, inventory, furniture and fixtures of the Hoffman House. It is also undisputed that this additional security interest was never obtained, even though a financing statement, UCC-1, was filed with the county clerk.

Facts that are in dispute include the circumstances pertaining to defendants signing of one of the promissory notes for $12,500. Paul Finke, executive vice-president of plaintiff bank, testified that he had met with defendants at the bank and had a lengthy discussion regarding the note. He testified that he told defendants that the amount of the loan on note No. 1 was $70,500. He also stated that he told them, and thought defendants understood, that there was a chance the business would not make it, and if so, they would be liable to pay $12,500 plus expenses.

Finke further testified contrary to the bank's position and the plain meaning of the notes that he told defendants that they would only have to pay if the property was sold and there was a deficiency. He told defendants that security for the loan consisted of the real estate, inventory, fixtures, and vehicles, and two other notes for $12,500.

Defendants testified that they first became aware of the transaction when Brad, Jodi, and Brad's parents came to defendants' home and Brad and Jodi told them that they were interested in buying the

Hoffman House. Brad and Jodi told defendants that the purchase price of the business was $53,000, and that in order to get the loan, they needed someone to sign a note for $12,500. At the end of that meeting, it was defendants' understanding that the price was $53,000, and that along with their note, Brad's grandmother was also going to sign a note for $12,500. Brad and Jodi returned a couple of days later with a financial statement and promissory note for defendants to sign. Defendants claimed that they never saw note No. 1 prior to signing the note for $12,500. They first saw note No. 1 in April 1988 when Paul Finke informed them that the loan was in default.

Surprisingly, defendants, even though they claimed that the plaintiff failed to deal fairly and in good faith with them, testified that the first time they ever met with Paul Finke was when Finke informed them that the loan was in default. Defendants denied knowing that the loan was for $70,500 and indicated that had they known that fact, they would not have signed the note for $12,500. It was defendants' understanding that they would be obligated to pay only if the loan was in default. Defendants were unaware that the automobiles and motorcycle were security and that Brad's parents were also signing a note for $12,500. They did understand, however, from Brad and Jodi that the loan was to be secured by a mortgage and a security interest in the inventory, equipment and other contents of the building.

Brad and Jodi defaulted on the loan, and plaintiff foreclosed and sued defendants to collect on the promissory note they had signed. Although plaintiff sued on the note itself, both parties agreed, contrary to the face of the notes, that the intent of the transaction was that defendants signed as guarantors only and were liable to pay on the note only if Brad and Jodi defaulted.

At trial, defendants' affirmative defense number seven alleged that plaintiff failed to deal fairly and in good faith in the preparation of documents and failed to exercise good faith in documenting and accounting for the various obligations of the parties. Plaintiff's motion to strike affirmative defense number seven was denied, but defendants were allowed to amend that defense at the end of trial without objection by plaintiff to add that plaintiff also "failed to obtain a security interest in inventory, equipment and other personal property."

At the jury instructions conference, defendants tendered a jury instruction based on *North Bank v. Circle Investment Co.* (1982), 104 Ill. App. 3d 363, 432 N.E.2d 1004, for the proposition that the failure to perfect a security interest constitutes an impairment of collateral and the guarantor is discharged. The trial court stated that the giving of that instruction would be tantamount to giving a directed verdict.

The trial court noted that the evidence presented by each side to this dispute was contradictory to its position in the trial. The trial judge finally decided out of frustration (we can sympathize and empathize with him), however, since Finke had testified as to the security interest in the equipment as being collateral that defendants relied upon, he was going to render a directed verdict in defendants' favor based on *North Bank*.

Plaintiff makes several arguments on appeal, but we need only consider one: whether a directed verdict is warranted in this case where plaintiff bank failed to obtain a security interest in the equipment of a business purchased. We hold that the directed verdict was improper for the reasons that follow.

■ The outcome in this case is dependent upon the documents relating to the loan, the parties' intentions, and the trial court's interpretation of *North Bank*. The promissory note defendants signed was separate from note No. 1. Neither document indicated that the defendants signed the note as guarantors; rather, the documents themselves indicate that defendants were liable as comakers on a promissory note for $12,500. It appears that the $70,500 loan was made up of four documents; note No. 1 signed by Brad and Jodi for $33,000, with the additional $37,500 financed through three other notes, each in the amount $12,500. In this case, however, the intention of all parties is clear; Brad and Jodi were primarily responsible for $70,500, and defendants were guarantors for $12,500. Defendants were obligated to pay up to $12,500 only if Brad and Jodi defaulted on the full $70,500. The trial court, with the participation of the parties, determined that defendants signed the note as guarantors. Where parties have adopted a particular construction of doubtful terms or conditions of a contract, the court will follow the construction which the parties placed upon it. (*Vermont Marble Co. v. Bayne* (1934), 356 Ill. 127, 190 N.E. 291, citing *McLean County Coal Co. v. City of Bloomington* (1908), 234 Ill. 90, 84 N.E. 624.) We will therefore apply the law applicable to separate guaranty agreements.

■ We now consider the trial court's application of *North Bank* to the case at hand. In *North Bank*, the guarantors signed a guaranty agreement printed on the reverse side of a promissory note. The loan was intended to be secured by certain collateral, but the bank failed to perfect a security interest in the collateral and the guarantor was discharged. *North Bank* relied on section 3—606 of the Uniform Commercial Code (Ill. Rev. Stat. 1973, ch. 26, par. 3—606), which stated, in part, that any party to an instrument would be discharged where the holder "unjustifiably impairs any collateral for the instrument."

(Ill. Rev. Stat. 1973, ch. 26, par. 3—606(1)(b).) *North Bank* stated that "the majority of States, including Illinois, agree that a failure to perfect a security interest constitutes an unjustifiable impairment of collateral." (*North Bank*, 104 Ill. App. 3d at 369, 432 N.E.2d at 1008.) The Illinois cases *North Bank* cited for this proposition, however, relied expressly on the language of section 3—606. *Wohlhuter v. St. Charles Lumber & Fuel Co.* (1975), 25 Ill. App. 3d 812, 323 N.E.2d 134, *aff'd* (1975), 62 Ill. 2d 16, 338 N.E.2d 179; *First Bank & Trust Co. v. Post* (1973), 10 Ill. App. 3d 127, 293 N.E.2d 907.

In order for section 3—606 to apply, however, the "instrument" must be negotiable. "Any writing to be a negotiable instrument *** must (a) be signed by maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer ***; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer." Ill. Rev. Stat. 1989, ch. 26, par. 3—104(1).

Defendants now concede that section 3—606 does not apply because the "guaranty," as the document is referred to by the parties, is not a negotiable instrument under section 3—104, because a separate guaranty agreement is not a negotiable instrument. (*Ishak v. Elgin National Bank* (1977), 48 Ill. App. 3d 614, 363 N.E.2d 159.) Defendants also state that the note was not an "unconditional promise to pay" because defendants' obligation to pay was dependent upon Brad and Jodi's default. This court has also held "that the impairment of collateral defense under section 3—606(i)(b) is unavailable to a guarantor executing a separate contract from the instrument." *City National Bank v. Reiman* (1992), 236 Ill. App. 3d 1080, 1090, 601 N.E.2d 316, 323.

It is contrary to defendants' position at trial for defendants to now admit that section 3—606 does not apply to this case, because, in light of that, the trial court's reliance on *North Bank* was admittedly misplaced and error. Defendants argue, however, that even though section 3—606 does not apply, full discharge of defendants is required by the common law principles of suretyship law as set forth in *North Bank*. While this may be true, the trial court based its ruling on the proposition that the failure to obtain a security interest is an impairment of collateral and made no finding on the facts of this case as they pertained to the "general principles of suretyship law."

The directed verdict in this case was based only on the holding of *North Bank*. The cases which defendants now urge us to rely on in affirming the decision of the trial court pertain to the fact that a sur-

ety or guarantor is entitled to be dealt with in good faith (*Watkins Products, Inc. v. Walter* (1973), 11 Ill. App. 3d 417, 296 N.E.2d 859; *Watseka First National Bank v. Ruda* (1988), 175 Ill. App. 3d 753, 531 N.E.2d 28, *rev'd on other grounds* (1990), 135 Ill. 2d 140, 552 N.E.2d 775), that where the rights of a surety have been materially prejudiced it is not necessary to show injury in order to be discharged from liability (*Passman v. Budnizky* (1936), 284 Ill. App. 533, 1 N.E.2d 707), that the security interest was an unfulfilled condition of the guaranty which required discharge (*Mount Prospect State Bank v. Forestry Recycling Sawmill* (1980), 93 Ill. App. 3d 448, 417 N.E.2d 621), and that the terms of the agreement were materially altered after defendants signed the guaranty. *Lawndale Steel Co. v. Appel* (1981), 98 Ill. App. 3d 167, 423 N.E.2d 957.

Defendants submitted instructions based on some of these cases, then withdrew them and submitted an instruction based on *North Bank*. The trial court did not make any ruling on these cases.

■ A directed verdict is properly rendered where all of the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern Ry. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Due to the conflicting testimony regarding the signing of the note, the fact that there was additional security which benefited the defendants, the fact that there was no evidence as to the value, if any, of the equipment, and the fact that it is not clear that defendants relied on the security interest in the equipment before they signed the note, we decline to make the determination as a matter of law that defendants were not dealt with in good faith or that they were materially prejudiced by the failure to obtain a security interest. We conclude that the directed verdict based on *North Bank* was error, and we reverse and remand for a new trial.

Reversed and remanded.

CHAPMAN, P.J., and WELCH, J., concur.