FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellee,

v.

Steven M. RAYMAN, Defendant–Appellant.

No. 96–2675.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1997.

Decided June 26, 1997.

---

3. Sams requested in his brief that we *sua sponte*    grant summary judgment in his favor.

Michael D. Freeborn, John E. Farrell, Freeborn & Peters, Chicago, IL, Kathryn R. Norcross (argued), Federal Deposit Insurance Corporation, Washington, DC, Brad L. Jansen, Federal Deposit Insurance Corporation, Division of Depositor & Assets Services, Chicago, IL, for plaintiff-appellee.

Deborah L. Kuhn, Keck, Mahin & Cate, Marc L. Fogelberg, Donald G. Mulack (argued), McBride, Baker & Coles, Chicago, IL, for defendant-appellant.

Before BAUER, WOOD, Jr. and COFFEY, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.

When he signed the guaranty for his $525,000 land purchase loan back in 1969, promising to pay the holder of the note if the loan went into default, Defendant–Appellant Steven Rayman surely had no idea that nearly thirty years later the loan would still be unpaid and that he would owe nearly twice its amount. In this case, Rayman appeals the district court's grant of summary judgment in favor of Plaintiff–Appellee Federal Deposit Insurance Corporation (FDIC)[1] in its suit to collect on the loan. He claims that genuine issues of material fact exist as to whether the FDIC increased his risk by allowing a portion of the land, which was serving as collateral for the loan, to be sold without informing him. Rayman also asserts the district court erred in holding that when he signed the guaranty to secure the loan the FDIC is enforcing, he waived the implied covenant of good faith and fair dealing; he claims the FDIC's actions regarding the collection of this debt violated that covenant. While we can do no more for Rayman than sympathize with him and agree that the FDIC has acted most unfairly, we also agree with the district court that back in 1969, Rayman waived the defenses he raises; thus, he has not raised genuine issues of material fact. We therefore must affirm the district court's grant of summary judgment for the FDIC.

I.

The facts of this case should serve as a warning to anyone preparing to sign an unconditional guaranty to pay a loan. In 1969 Rayman purchased Kenilworth Oaks, a 14–building, 96–unit residential complex in Elgin, Illinois, from the Federal Savings and Loan Insurance Corporation (FSLIC) through Hoyne Savings and Loan Association (Hoyne). The Merchants National Bank of Aurora, Illinois acted as land trustee and executed a promissory note for $525,000 payable to Hoyne at eight percent interest. The property itself served as collateral to secure the loan. At this time, Rayman also signed the personal guaranty that causes the problem here. The guaranty provides:

1. The undersigned unconditionally and absolutely guarantees the due and punctual payment of the full amount of the Note executed concurrently herewith by the aforesaid Trustee in the amount of FIVE HUNDRED TWENTY–FIVE THOUSAND AND NO/100 DOLLARS ($525,000.00) and any interest thereon, and any other monies due or which may become due pursuant to the terms thereof.

2. In the event of the failure of the Trustee aforesaid to comply with the terms of the aforementioned Note, the undersigned waives notice of acceptance of this guaranty, diligence, presentment,

---

1. Rayman originally received the loan from the Federal Savings and Loan Insurance Corporation (FSLIC), which was dissolved in 1989. As part of the FSLIC takeover and reorganization, the loan documents were transferred to the FDIC, which is now suing to enforce them. For purposes of this opinion, other than in the facts section, we refer to them collectively as "FDIC."

protests, Notice of Dishonor, demand for payment, and any and all notices of whatever kind or nature and the exhaustion of legal remedies available to the Holder of said Note.

Rayman also negotiated for a provision in the note which stated that the holder of the note could not foreclose on the property unless the monthly payments were at least 45 days past due and Rayman was notified of the foreclosure. Once all the papers were signed and in order, Hoyne assigned the note, mortgage and guaranty to FSLIC. FSLIC then assigned the promissory note to Unity Savings in 1971.

In 1976, seven years after he purchased the complex, Rayman sold Kenilworth Oaks to Gary Lemkau and Paul Stansell via an Assumption and Indemnification Agreement, acknowledging, however, that Rayman's duties as guarantor were not changed. When Lemkau and Stansell defaulted on the note in 1977, Unity Savings gave them a chance to bring their obligation up to date by allowing them to sell part of the complex. They sold Lot 39, also known as 809 Sharon Court, the "gateway parcel" and prime real estate of the project, for $29,510. Of the proceeds $20,000 was credited to the partial release and the remaining $9,510 was applied to other debt. No one notified Rayman of the sale and release of this part of the collateral.

Stansell and Lemkau sold the remainder of the property to Richard Wanland in 1978. With the sale, Wanland assumed the obligation to pay the outstanding debt but Rayman was not released from his obligation as guarantor. In 1980 Wanland was two months delinquent with his mortgage payments and Rayman received a letter informing him of the amount and the length of time of the delinquency. When he heard nothing more, he assumed, correctly as it turned out, that Wanland had corrected the delinquency. In September 1982, however, Wanland caused more trouble when he allowed the mortgage to go into default, and he made no payments until 1986.

Meanwhile, Unity Savings merged with Talman Federal Savings and Talman became the owner of the loan documents. When Wanland defaulted on his debt, Talman decided not to foreclose or collect the debt in any other way; instead, it waited and let the arrearage and interest accrue. In 1983, a year after Wanland first defaulted on the mortgage, Talman submitted the defaulted loan to FSLIC for repurchase under an agreement by which FSLIC would repurchase loans that became more than 90 days delinquent. Negotiations began regarding the repurchase, and during this time all collection activity on the loan stopped.

In 1985, Wanland received a notice from the tax assessor's office informing him that the Kenilworth Oaks property had been sold to pay delinquent taxes and instructing him that he had until October 1987 to redeem it. In April 1986 Wanland asked FSLIC to redeem the property, but it refused. In December of that year FSLIC resolved a three-year-long bureaucratic dispute over whether its Washington or Chicago office would handle the repurchase, and it decided that it would agree to repurchase the Kenilworth Oaks property from Talman.

FSLIC notified Rayman in February 1987 that it was foreclosing on the property because of delinquent payments. It did not demand payment from him, however, and it did not follow through on its intention to foreclose. Rayman assumed that Wanland had corrected the default, as he had in 1980. Unfortunately for Rayman, this time his assumption was in error, but he remained unaware of that fact. In June 1987 FSLIC again refused to redeem the property from the tax sale, but did not notify Rayman of this decision.

FSLIC dissolved in 1989 and at that time FDIC acquired the loan documents, including the guaranty, as manager of the FSLIC Resolution Fund. Two years later FDIC made its first demand for payment from Rayman. Only then, in 1991, did Rayman learn of the sale of Lot 39 in 1977 and the sale of the remainder of the property in 1985 to pay real estate taxes which had been due in 1983. FDIC filed this lawsuit against Rayman as guarantor for the collection of the balance due on the defaulted mortgage. By this time, the unpaid principal amounted to $315,-

875.52 and the interest accrued (at eight percent) was $246,815.54. The district court entered summary judgment for FDIC for the unpaid principal and interest, but the court calculated the interest at a twelve percent default rate. The final judgment entered against Rayman was $807,914.44. The court also entered summary judgment in Rayman's favor for the entire amount against Stansell and Lemkau; however, as they have no assets to pay the judgment, this does not help Rayman. He has therefore appealed to this court.

## II.

■ We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Rayman, the non-moving party, to determine if any genuine issues of material fact exist. *Bay State Milling Co. v. Martin,* 916 F.2d 1221, 1225 (7th Cir.1990). Rayman has alleged several issues; our task is to determine whether the unconditional guaranty he signed stands in the way of their being genuine issues of material fact.

Rayman has two main arguments on appeal. First, he asserts the risk that he assumed when he signed the guaranty was materially increased when Unity Savings allowed Lemkau and Stansell to sell and release Lot 39 from the collateral without informing him of the sale. That particular parcel was the prime real estate of the entire project and Rayman had relied on its being part of the collateral when he signed the guaranty. When it was sold, the value of the land as collateral was diminished and his risk increased. As a result, Rayman claims he should be discharged as guarantor.

Next, Rayman argues that the FDIC's actions, taken as a whole, constitute an abuse of discretion and violate the implied covenant of good faith and fair dealing. These actions include the FDIC's failure to initiate a foreclosure action when payments on the note became delinquent (allowing the interest to accumulate), failure to redeem the property after the tax sale, and failure to notify him of the default and the tax sale. Rayman also claims the FDIC should be equitably estopped from collecting on the debt, because it affirmatively misled him when it announced its intention to foreclose on the property and then failed to do so. This prevented Rayman from discovering the tax sale and caused him to erroneously believe the FDIC would collect any delinquent mortgage payments and protect the property. Because he relied on this misrepresentation, Rayman asserts, he suffered the loss of the collateral in the tax sale and increased damages because of the large amount of accrued interest.

For its part, the FDIC has a consistent answer to each of these charges: Rayman signed an absolute and unconditional guaranty, waiving his right to raise these defenses. In response to questions about why it took so long to foreclose on this property, FDIC admits there was "confusion," and that it was unfortunate, but FDIC also argues that confusion does not constitute bad faith and it is not a defense to a suit to collect on the debt. "Confusion" is putting it mildly; we understand Rayman's frustration and outrage with the dilatory practices of the FDIC in this case. These facts can only reinforce the unfortunate stereotype of a lackadaisical government bureaucracy.

However, as much as we sympathize with Rayman, the FDIC and the district court are correct. When Rayman signed the unconditional guaranty, he waived his right to bring every one of the defenses he raises in this case. When he waived "notice of acceptance of this guaranty, diligence, presentment, protests, Notice of Dishonor, demand for payment, and *any and all notices of whatever kind or nature*" (emphasis added), Rayman accepted the risk that the people to whom he sold the land would default on the loan and fail to pay taxes, leaving him responsible as guarantor for the debt, and he also accepted the risk that the FDIC would move slowly in collecting the debt from him. We cannot rewrite the guaranty he signed.

■ The parties agree that Illinois law applies in this case. In Illinois, a guaranty is a legally enforceable contract that must be construed according to its terms, so long as they are clear and unambiguous. *Kolson v. Vembu,* 869 F.Supp. 1315, 1320 (N.D.Ill. 1994); *FIMSA Inc. v. Unicorp Fin. Corp.,*

759 F.Supp. 1297, 1300 (N.D.Ill.1991). The terms of this guaranty are clear, and so we presume that Rayman intended what is written, *see Jacobson v. Devon Bank*, 39 Ill. App.3d 1053, 351 N.E.2d 254, 256 (1976), and that he knew and understood the implications of what he signed. *See Leon v. Max E. Miller & Son, Inc.*, 23 Ill.App.3d 694, 320 N.E.2d 256, 260 (1974). It is significant that Rayman negotiated for an additional term in the guaranty requiring 45 days notice before foreclosure proceedings could be initiated; we must presume he realized what it meant to be a guarantor of payment and he understood that by signing the guaranty, he waived his right to be notified of problems in all other circumstances.

### A.

■ One risk Rayman accepted when he signed the guaranty using the land as collateral was that future owners would damage the collateral in some way, and would, consequently, increase Rayman's risk that he would have to pay the debt. Rayman claims Unity Savings, Lemkau and Stansell sold Lot 39, the "gateway parcel" to the complex, for much less than its fair market value. Although $20,000 was applied to the outstanding debt on the loan, Rayman claims that the overall reduction in the value of the land so materially increased his risk that he should be discharged as guarantor. Rayman's main complaint, however, is not so much that Lot 39 was sold, but that Lot 39 was sold for too little money and without his knowledge or consent. In other words, he wanted Unity Savings to have notified him of the sale and he wanted a chance to object to the sale and/or the sale price. But Rayman expressly waived his right to notice and the opportunity to object to such an action when he signed the guaranty; consequently, the lack of notice cannot provide a defense for him here. Rayman cites several cases to support the claim that he should have been notified of the sale of Lot 39 because it materially increased his risk. Those cases can be distinguished, however, because the guaranties involved either contain less comprehensive waivers of notice or they include provisions requiring that the guarantor be notified and give consent before certain actions causing a material

increase in risk could be taken. *See Depositors Trust Co. v. Hudson General Corp.*, 485 F.Supp. 1355, 1361 (E.D.N.Y.1980); *Security Bank, N.A. v. Mudd*, 215 Mont. 242, 696 P.2d 458, 459 (1985); *Fassett v. Deschutes*, 69 Or.App. 426, 686 P.2d 1034, 1037–38 (1984). Here, the guaranty waives all notice except for that regarding the implementation of a foreclosure action.

■ Furthermore, "[a] guarantor of payment, as distinguished from a guarantor of collection, cannot avail himself of the defense that the creditor through negligence, or the lack of due diligence, lost or dissipated the collateral furnished by the debtor." *United States v. Shirman*, 41 F.R.D. 368, 373 (N.D.Ill.1966). Rayman unconditionally promised to pay the debt if the loan went into default, and he cannot now insert a condition requiring that he should have been notified before a portion of the land was sold to pay some of the debt and prevent default. The sale reduced his own obligation by $20,000, and though he may have insisted on a higher purchase price, he did not negotiate for the right to be notified and to give his consent before a portion of the land was sold. Therefore, we will not discharge Rayman as guarantor simply because Lot 39 was sold; again, when Rayman signed the waiver of defenses, he took the risk that the collateral would not be available to satisfy the debt.

■ In addition, we also agree with the district court that Rayman's impairment of collateral defense fails because the guaranty he signed is a non-negotiable instrument. It is well established in Illinois that the Uniform Commercial Code's impairment of collateral defense is unavailable to a guarantor who exercises a guaranty separate from the underlying contract, because the guaranty is not a negotiable instrument. *See Farmers State Bank of Hoffman v. Schulte*, 241 Ill. App.3d 90, 181 Ill.Dec. 621, 624, 608 N.E.2d 694, 697 (1993); *City National Bank of Murphysboro v. Reiman*, 236 Ill.App.3d 1080, 175 Ill.Dec. 919, 925–26, 601 N.E.2d 316, 322–23 (1993). In any event, "the defense of impairment of collateral is not available to one who has given an unconditional guaranty of payment." *Istituto Mobiliare Italiano S.p.A. v. Motorola*, 689 F.Supp. 812, 817 (N.D.Ill. 1988).

### B.

We next turn to Rayman's contention that the FDIC violated the covenant of good faith and fair dealing with a totality of its actions. While Rayman is correct that absent express disavowal, a covenant of good faith and fair dealing is implied in every Illinois contract, *see Chemical Bank v. Paul*, 244 Ill.App.3d 772, 185 Ill.Dec. 302, 307, 614 N.E.2d 436, 441 (1993), *citing Lincoln Park Federal Savings & Loan v. Carrane*, 192 Ill.App.3d 188, 139 Ill.Dec. 251, 254, 548 N.E.2d 636, 639 (1989), "the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). In other words,

'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith ... fill the gap. They do not block use of terms that actually appear in the contract.

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990).

While the guaranty does not specifically address whether the FDIC had a duty to notify Rayman in the event that, for example, the property was sold at a tax sale and the FDIC would not redeem it, it is certainly not silent. The guaranty expressly provides that Rayman waived his right to object to the FDIC's failure to notify him in any circumstance except a decision to foreclose on the property. Consequently, there is no gap to fill. The FDIC did nothing that the guaranty did not allow it to do. Rayman could have negotiated for another provision requiring the holder of the note to inform him of a tax sale or default, just as he did with the provision requiring notice in the event of a foreclosure, but he did not do that. Furthermore, although the FDIC's conduct was certainly not admirable, there is no evidence that it took deliberate, "opportunistic advantage" of Rayman. As a result, there are no genuine issues of material fact regarding the FDIC's duty of good faith and fair dealing toward Rayman.

Rayman also argues that the FDIC should be equitably estopped from collecting the debt from him because it affirmatively misled Rayman by telling him it was going to foreclose on the property, but never did. When he heard nothing more, Rayman assumed that the FDIC had chosen to look to the property to satisfy the debt and that his obligation was discharged. Unfortunately, the property was sold at a tax sale and the FDIC didn't foreclose, so the FDIC turned to Rayman instead. An equitable estoppel defense has three elements: (1) misrepresentation, (2) reasonable reliance on that misrepresentation, and (3) detriment. *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir.1992). Because Rayman has not alleged sufficient facts to establish a claim for equitable estoppel, this argument must fail as well. For one thing, it does not appear that the FDIC engaged in affirmative misrepresentation. It may have intended to foreclose on the property, but circumstances, such as the tax sale, may have prevented the foreclosure. And although the FDIC was required to notify Rayman—and did notify him—of its intent to foreclose, it was not required to tell him when it changed its mind. That may have been the thoughtful and professional thing to do, but it was not required. In addition, Rayman's reliance on the FDIC's letter may not have been reasonable. He made no inquiries as to whether the foreclosure had taken place and instead just assumed that Wanland had satisfied the debt. This assumption contributed to Rayman's detriment as much as did the FDIC's failure to follow up on the letter.

### C.

Finally, while we certainly do not condone the dilatory and unprofessional practices of the FDIC observed in this case, we are left wondering whether Rayman himself acted in a less than responsible manner. Surely when he agreed to serve as guarantor and then proceeded to sell the land to another party without discharging his obligation, he knew that he would be liable if they defaulted on the loan. But Rayman himself notes in his brief, "[i]t must be remembered that Rayman had nothing to do with the property since 1976, when he sold it." Why not, when

he was still liable as guarantor, his fate was in the hands of the subsequent purchasers of the land, and he had waived his right to be notified of any problems in all but one circumstance? In Illinois, guarantors "have an obligation to make an inquiry into all circumstances that are relevant to their risk as guarantors." *Continental Bank, N.A. v. Everett,* 760 F.Supp. 713, 718 (N.D.Ill.1991), *aff'd,* 964 F.2d 701 (7th Cir.1992), *citing St. Charles Nat'l Bank v. Ford,* 39 Ill.App.3d 291, 349 N.E.2d 430, 434 (1976). It is clear that Rayman failed to make inquiries into whether the subsequent owners were making payments and paying taxes. Had he done more than just assume that Wanland's delinquencies were resolved, he might have found out on his own about the sale of Lot 39 and the tax sale of the rest of the property much earlier.

The district court's grant of summary judgment in FDIC's favor is

AFFIRMED.